**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RYAN NOAH SHAPIRO,<br><br>Plaintiff,<br><br>v.<br><br>CENTRAL INTELLIGENCE AGENCY *et. al.*,<br><br>Defendants. | Civil Action No. 14-019 (CRC)<br><br>ECF |

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT AS TO THE DEFENSE INTELLIGENCE AGENCY

Defendant, the Department of Defense ("DOD"), respectfully opposes plaintiff's motion for partial summary judgment as to the Defense Intelligence Agency ("DIA"). *See* ECF No. 26. Although plaintiff captions his filing as a motion for partial summary judgment, in effect, he seeks a status conference in which the Court might consider the DIA's pace of processing records responsive to plaintiff's FOIA request. Rather than simply move for a status conference, however, plaintiff filed a motion for summary judgment seeking "a declaration that the DIA is in violation of its FOIA obligations." (Mot. 5). Such a declaration would do nothing to advance the litigation: the question at this point is not whether DIA met the 20-day statutory deadline, but whether, at present, DIA is reasonably responding to plaintiff's request. Indeed, given that this case is already in federal court, the DIA's failure to meet the 20-day deadline is irrelevant to current and future proceedings. *See CREW v. FEC*, 711 F.3d 180, 188 (D.C. Cir. 2013) ("If the agency does not adhere to FOIA's explicit timelines, the 'penalty' is that the agency cannot rely on the administrative exhaustion requirement to keep cases from getting into court.").

As explained below and in the attached Declaration of Alesia Y. Williams, DIA is moving heaven and earth to respond to a massively broad request that plaintiff has refused to limit in any respect. Indeed, contrary to plaintiff's suggestion that DIA's response has been "glacial" (Mot. 5), DIA's good-faith efforts to respond to plaintiff's request – which have included paying its small staff overtime to work weekends – have grown to dominate its FOIA office to an unsustainable degree. Although plaintiff might be dissatisfied with DIA's inability to immediately process some 65,000 potentially responsive records, many of which are of no conceivable value, plaintiff is not entitled to the impossible.

**A. Plaintiff's request is massively broad and hugely burdensome, yet he has refused to limit it despite the evident uselessness of many results**

On December 11, 2013, Plaintiff's submitted to DIA a FOIA request seeking all records related to former South African President Nelson Mandela, who had died the previous week. Williams Decl. ¶ 6. Due to Mandela's status as a world figure over the course of many decades, DIA initially determined that it was likely it maintained a significant amount of information concerning Mandela that would not be considered intelligence collection with respect to him as a person. *Id.* ¶ 10. Indeed, DIA predicted that it could be a very complex and time-consuming process just to identify what is actually responsive, and to eliminate duplicate records. For example, DIA expected that many responsive records would not relate to Nelson Mandela as an individual, but instead would use his name in other ways: it identified a significant amount of information that merely refers to buildings, streets, and airports named after the former South African leader. Similarly, there are references to periods of time using his name as a description, such as "the Nelson Mandela era." Because these documents referencing landmarks named after the former South African leader and referencing "the Nelson Mandela era" actually have nothing to do with the man himself, DIA reasonably deemed them "not responsive" to the FOIA request.

Unfortunately, notwithstanding the staggering breadth of plaintiff's request and the resulting need (described above) to individually examine many records that would turn out to be nonresponsive, discussions about possible revisions to the scope of the search were not productive. Plaintiff advised that he continued to seek every record that mentioned the name Nelson Mandela (along with his other names, as outlined in the request) with no limitations. *Id.* ¶ 11. Therefore, in the end, DIA used the variations on Nelson Mandela's name contained in plaintiff's request letter to conduct a search. *Id.* ¶ 12.

As a result of this search, DIA was able to identify approximately 64,000 potentially responsive documents that contain Nelson Mandela's name. Of these, approximately 50,000 potentially responsive documents appear to be related to the news media coverage of Nelson Mandela over the course of many years. Upon identification of the search results, DIA began preliminary review of the documents. DIA advised Mr. Shapiro in a status report in January 2015 that it may take as long as twenty-four months to process his request, an aggressive pace that would require processing for release determinations to be made for between 2,000 and 3,000 documents each month. *Id.* There is nothing unlawful about such a realistic prediction.

**B. DIA's response to plaintiff's request has been, if anything, unsustainably aggressive.**

In plaintiff's motion (at 3), he faults the DIA for the fact that "this case was pending for over a year before a single page of responsive records had been released (or apparently processed for release)." As explained in its status reports, though, this unavoidable delay was caused not by "foot-dragging" (Mot. 3), but by the unfortunate fact that plaintiff's request coincided with an overhaul of DIA's computerized record-retrieval system that did not go smoothly. As explained in the Williams Declaration, DIA conducted its initial search in an old database, which crashed in early 2014. A new search database was implemented prematurely, without extensive testing. Upon use of the new search database, it was determined that functions previously available in the

old search database were not operational. Unfortunately, DIA immediately experienced technical problems with its new software search capability with respect to broad searches and the identification of responsive records. Thus, for the remainder of 2014, DIA worked with the software provider to create a fix that would allow the search capability to perform effectively when searching broadly. Williams Decl. ¶ 9.

DIA's technical difficulties now appear to be in the past, and DIA is processing records at a pace that, if anything, is unsustainably aggressive. In defendant's April 23, 2015 Status Report (ECF No. 27), DIA reported that, for March and April, it reviewed more than 4,500 documents for relevancy (1,845 in March and 2,707 in April). Those documents have been referred for processing, identified as duplicates, identified as non-responsive, or referred to the originating agency. Thus, despite plaintiff's evident dissatisfaction at the pace of releases, the fact is that DIA is working aggressively to comply with plaintiff's request.

The DIA FOIA operation is small by the standard of most agencies, employing only twenty-three people. Despite its small size, each year it processes approximately 1,300 FOIA and Privacy Act (PA) requests and approximately 100 administrative appeals, along with approximately 300 FOIA and PA consultations from other agencies. At the present time, DIA is actively involved in fifteen FOIA lawsuits as a named defendant, and it is processing referrals and consultation requests related to forty-five additional FOIA lawsuits. Williams Decl. ¶ 13.

Despite its size, the DIA FOIA office has proved itself efficient and effective. Williams explains that, when she first assumed a leadership role in the DIA FOIA program in 2008, DIA was experiencing a growing backlog of FOIA requests. This backlog created significant delay for the average FOIA requester, who had wait in line behind approximately 3,000 backlogged requests. In order to fix this problem, DIA streamlined procedures, acquired new computer

equipment and doubled the number of personnel to include federal employees as well as contractors to reduce both the backlog and processing times. As a result of this effort, the backlog was reduced by over sixty percent over the course of six years. Unfortunately, in August 2014, funding for the contractor assistance expired. As a result, the DIA FOIA program lost its contractor staff, which represented 25 percent of the FOIA program personnel. Williams Decl. ¶ 14.

In the face of this personnel setback, in 2014 and 2015, DIA has experienced an increase in the size and complexity of the FOIA requests it received. This unpredictable change once again challenges the FOIA program to keep up with the incoming requests. This surge in FOIA activity also covers litigation, where the normally predictable caseload of approximately five cases per year has increased dramatically. DIA's two FOIA litigation analysts now manage a much larger litigation caseload of fifteen active primary cases and forty-five cases involving referrals or consultations. Beyond the simple increase in the number of cases, DIA's FOIA program is seeing a significant increase in the complexity and scope of each case. *Cf. Open America v. Watergate Special Prosecution Force*, 547 F.2d 605, 616 (D.C. Cir. 1976) (agency entitled to a stay if it is "deluged with a volume of requests vastly in excess of that anticipated by Congress, when the existing resources are inadequate to deal with the volume of requests within the [statutory time limit]"). *Id.* In light of these increased demands, the DIA FOIA program is attempting to acquire additional contract resources. However, due to government sequestration, funding is extremely limited, and even if additional funding were acquired, this process generally lags one to two years behind the need. Williams Decl. ¶ 15.

With respect to this case specifically, because of the unfortunate technical difficulties that delayed DIA's immediate and effective search for records responsive to plaintiff's request,

Williams explains that she made an effort to surge forward in the review of the potentially responsive documents. *Id.* ¶ 16. Her hope was that DIA could demonstrate that it was making a good-faith effort to fulfill plaintiff's request. To that end, in March and April alone, DIA invested at least 220 hours of employee time to processing the request. This meant seeking the overtime efforts of 11 additional employees who volunteered to work on Saturdays in an attempt to keep up the pace. In addition, in mid April, DIA dedicated two more employees from its FOIA staff to work full-time processing plaintiff's request. As a result of these combined efforts, DIA was able to review more than 5,000 documents for responsiveness and elimination of duplicates. *Id.* The next step of the process is to refer other agencies originated documents, consult with offices within DIA and or other government agencies for declassification review. *Id.*; *see also* 4/23/15 Status Rpt. (ECF No. 27) (explaining that DIA reviewed more than 4,500 documents in March and April).

Unfortunately, Williams explains, the effort to process plaintiff's request has consumed a larger proportion of the DIA FOIA Office's resources than was originally projected. Consequently, to properly allocate resources in a manner that is fair to all requesters and properly manages all cases in litigation, Williams has determined that DIA cannot continue to dedicate such a high percentage of resources – including large amounts of overtime – to this single case. However, given the resources available, DIA anticipates that it can reasonably review 4,000 records per month to determine if they are responsive. As records are determined to be responsive, DIA will refer them to the originating offices and agencies for processing. At that aggressive and appropriate rate, it will take approximately 48 months to process and release all non-exempt records to plaintiff. Plaintiff's demand for more is unreasonable: the lengthy timetable is due primarily to plaintiff's refusal to limit his request to any degree, and the D.C.

Circuit has "readily acknowledge[d] that there are some limits on what an agency must do to satisfy its FOIA obligations." *Schrecker v. DOJ*, 254 F.3d 162, 165 (D.C. Cir. 2001) (quoting *Nation Magazine, Washington Bureau v. U.S. Customs Service*, 71 F.3d 885, 891-892 (D.C. Cir. 1995)).

Should the Court have further questions about the DIA's good-faith efforts in this case, defendant is certainly amenable to a status conference to discuss them. Plaintiff's motion, however – which seeks only a declaration that the DIA did not meet the 20-day statutory deadline – would not advance the litigation in any respect, and such a dispositive motion should be denied without prejudice to refiling once DIA's releases are substantially complete.

For the foregoing reasons, defendant DOD requests that plaintiff's motion be denied.

Dated: May 7, 2015.

Respectfully submitted,

VINCENT H. COHEN, JR., DC BAR # 471489
Acting United States Attorney

DANIEL F. VAN HORN, DC BAR # 924092
Chief, Civil Division

By: ___*/s/ Damon Taafffe*________
DAMON TAAFFE, D.C. Bar. # 483874
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 252-2544

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| RYAN NOAH SHAPIRO,<br><br>Plaintiff,<br><br>v.<br><br>CENTRAL INTELLIGENCE AGENCY *et. al.*,<br><br>Defendants. | ) | Civil Action No. 14-019 (CRC)<br><br>ECF |

**[PROPOSED] ORDER**

UPON CONSIDERATION of plaintiff's motion for partial summary judgment with respect to the DIA, it is hereby

ORDERED that the motion is DENIED, and it is

ORDERED that DIA will continue to process plaintiff's request at the rate described in its April 23, 2015 status report.

SO ORDERED.

________________________
Date

____________________________________
United States District Judge