```
1                   IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2
     - - - - - - - - - - - - - - - x
3    RYAN NOAH SHAPIRO,
                                        CA No:  1:14-cv-00019-CRC
4                 Plaintiff,
                                        Washington, D.C.
5                                       Monday, June 8, 2015
     vs.                                11:02 a.m.
6
     CENTRAL INTELLIGENCE AGENCY,
7    et al.
                  Defendants.
8    - - - - - - - - - - - - - - - x

9    _____

10                 TRANSCRIPT OF STATUS CONFERENCE
          HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                   UNITED STATES DISTRICT JUDGE
12   _____

     APPEARANCES:
13

14   For the Plaintiff:       JEFFREY LOUIS LIGHT, ESQ.
                              LAW OFFICES OF JEFFREY LIGHT
15                            1712 Eye Street, NW, Suite 915
                              Washington, DC 20006
16                            (202) 277-6213
                              jeffrey@lawofficeofjeffreylight.com
17

18   For the Defendants:      ROBIN MICHELLE MERIWEATHER, ESQ.
                              U.S. ATTORNEY'S OFFICE
19                            555 Fourth Street, NW
                              Washington, DC 20530
20                            (202) 252-2538
                              robin.meriweather2@usdoj.gov
21
     Court Reporter:          Lisa A. Moreira, RDR, CRR
22                            Official Court Reporter
                              U.S. Courthouse, Room 6718
23                            333 Constitution Avenue, NW
                              Washington, DC  20001
24                            202-354-3187

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer-aided transcription
```

1              P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  Civil Case No. 14-19, *Ryan*

3    *Shapiro vs. Central Intelligence Agency*.  Counsel, will you

4    please come forward and identify yourselves for the record.

5              MR. LIGHT:  Good morning, Your Honor; Jeffrey

6    Light on behalf of plaintiff, Ryan Shapiro.

7              THE COURT:  Mr. Light, you're on this side this

8    time.

9              MR. LIGHT:  Yes.

10             MS. MERIWEATHER:  Good morning, Your Honor; Robin

11   Meriweather on behalf of the defendant DIA.  Also with me at

12   counsel table I have my agency counsel, Brent Evitt, who is

13   deputy general counsel.

14             THE COURT:  Mr. Evitt.

15             MS. MERIWEATHER:  And we have the head of the DIA

16   FOIA office, Alesia Williams.

17             THE COURT:  Ms. Williams.  It's a pleasure.

18             Why don't you both come up.  That will make it

19   easier.

20             Where are we since the reply brief and the order

21   to meet and confer?  Have you all discussed the issues

22   indicated in the minute order, or no?

23             MR. LIGHT:  Yes, Your Honor.  The parties have had

24   an opportunity to meet and confer.  I spoke with the

25   assigned AUSA, Mr. Taaffe.

1          (To Ms. Meriweather) Is that --

2          MS. MERIWEATHER:  Yes.

3          MR. LIGHT:  And it was a productive discussion in

4     that I was able to gain some additional information about

5     the processing, what's occurred so far, and the government's

6     agreed that going forward certain additional information

7     will be included in the status reports.

8          THE COURT:  Okay.  Has there been any agreement on

9     the pace of processing, or is that still in dispute?

10          MR. LIGHT:  Mr. Taaffe told me I needed to explore

11     that at the hearing today.  The government wasn't willing to

12     commit to any production schedule.

13          THE COURT:  Ms. Meriweather, I was a little

14     confused as to what pace you would project processing the

15     requested documents at.  There were figures for roughly

16     1,800 documents processed in March and 2,700 in April, but

17     there was a suggestion that that might be an overly

18     aggressive pace to maintain; at the same time there was an

19     estimate that 4,000 pages per month could be processed.

20     What's the right expectation?

21          MS. MERIWEATHER:  I think it varies by the

22     document.  It's hard to give a precise number.  The agency

23     is -- and we did describe it as an extremely aggressive

24     pace, but the agency has continued, and, in fact, has

25     continued to work as quickly as possible, including using

1    resources of overtime.  And as I understand it, the initial

2    review for relevancy in June was even higher of 6,000

3    documents so --

4          THE COURT:  And is it documents, or is it pages?

5          MS. MERIWEATHER:  Documents.

6          THE COURT:  Documents, okay.

7          MS. MERIWEATHER:  And so it's -- because the

8    documents are all different, unfortunately I can't give an

9    actual number of how many documents we would do each month.

10         THE COURT:  Well, it's somewhat difficult to

11   assess the reasonableness of the agency's pace if there's no

12   more concrete estimate based on the last few months of

13   processing and resources available as to what the pace will

14   be going forward.

15         MS. MERIWEATHER:  If I could have a moment?

16         THE COURT:  Yes.

17         MR. EVITT:  Your Honor, if I could, maybe I could

18   shed some light on this.  I'm the attorney for the DIA.

19         So the request is actually for all records related

20   to Nelson Mandela so, Your Honor, what we're doing is we've

21   done a search of our system, which identified 64,000

22   potentially responsive records, so this can be anything from

23   a document that's actually about Nelson Mandela the person

24   to a mere reference to Nelson Mandela in some other

25   document.  It could be Nelson Mandela Elementary School or

1   Airport --

2          THE COURT:  Airport.

3          MR. EVITT:  -- anything like that.  So the first

4   step is to go through each of those documents one by one and

5   decide whether they're responsive, whether they originated

6   with DIA, and then what we do with them from there.  So if

7   it is responsive and it did originate with DIA, then is goes

8   for processing, which is the second step.

9          THE COURT:  Okay.  So the 1,800 figure and the

10  2,700 figure for March and April respectively, were those

11  just initial, you know, someone laid eyeballs on the --

12         MR. EVITT:  Yes, Your Honor.

13         THE COURT:  -- on the document?  Okay.

14         MR. EVITT:  We pull the document and decide

15  whether it's responsive.

16         THE COURT:  And the estimate in the papers or at

17  least what I took to be the estimate in the papers of a pace

18  of 4,000 per month going forward, that would be that initial

19  review as well.

20         MR. EVITT:  Yes.  That's the responsiveness check.

21  And that will come to an end, of course, at some point

22  because we'll run out of documents to review for

23  responsiveness.  Parallel to this process is the actual

24  review of the document for release.

25         THE COURT:  Okay.  And you're still committed to

```
1     that 4,000-document-per-month --

2               MR. EVITT:  Yes, Your Honor.

3               THE COURT:  -- relevancy review?

4               MR. EVITT:  Uh-huh.

5               THE COURT:  And is that where the bottleneck is,

6     or is it in the responsiveness?

7               MR. EVITT:  Well, at the moment it's in the review

8     for responsiveness that is causing the bottleneck.

9               THE COURT:  Okay.

10              MR. EVITT:  So now, as documents are discovered to

11    be responsive, they're put over in the processing queue, and

12    that is going on simultaneously.  And at some point the

13    responsiveness review will stop and will all be about

14    processing.

15              THE COURT:  Okay.  Now, Mr. Light, what is the

16    objection to that pace?  I mean, let's put aside the

17    technical difficulties that seem to have slowed the review

18    down thus far, but now that we're on track, is there

19    something to suggest that that is not an efficient and

20    appropriate pace to expect given the resources of the FOIA

21    office of DIA?

22              MR. LIGHT:  Well, at the rate proposed, 4,000

23    pages a month, we're looking at -- for processing 64,000

24    pages -- quite a while.

25              THE COURT:  Well, because there are 64,000 pages.
```

1           MR. LIGHT:  Right.  But the issue we have is

2     primarily not with the responsiveness -- the rate of the

3     responsiveness, but the rate of processing for determination

4     of release.  In the last status report, the DIA reviewed

5     6,189 records and determined that 1,031 records were

6     responsive, and of those, they then switched to a page count

7     for the number that were determined for release, 721 pages

8     within 100 documents.  So of that 1,031, only 100 were

9     reviewed for release.

10          Our problem is with that 100 --

11          THE COURT:  Were 100 reviewed for release, or were

12    100 determined to be releasable?

13          MR. LIGHT:  Zero were determined to be releasable.

14    100 were reviewed for release.  So if the -- it doesn't

15    actually sound like the bottleneck is on reviewing for

16    responsiveness if they were able to do 1,000 documents for

17    responsiveness and only 100 for release determination.

18          THE COURT:  Okay.

19          Now, having come from supervising civil

20    litigation, reviewing 100 documents in a month does not

21    sound like a terribly quick pace.  Why am I wrong?

22          MS. MERIWEATHER:  The problem with the difficulty

23    with this group of documents, Your Honor, is the necessity

24    of reviewing for classified material.

25          THE COURT:  Understood.

1          MS. MERIWEATHER:  That is what takes a substantial

2     amount of time.  And in addition, we've had a decent number

3     of records that were -- that belong to other agencies that

4     DIA has had to refer out.  So it actually -- those two

5     things combined are what make it take longer to do the level

6     of scrutiny necessary to determine what is releasable and

7     what's exempt under FOIA, as opposed to the first cut of "Is

8     this really responsive to the plaintiff's" --

9          THE COURT:  Is Mr. Shapiro's request being given

10    the same level of attention as other competing requests, or

11    have others been prioritized over his in terms of the review

12    for release?

13         MS. MERIWEATHER:  Yes.  We're giving more -- my

14    understanding, and it's been confirmed by agency counsel, is

15    that this request is getting more attention than is standard

16    within the agency.

17         THE COURT:  Okay.

18         There's only so much blood in the turnip,

19    Mr. Light.

20         MR. LIGHT:  I understand, Your Honor, but the

21    representation about the other government agencies at the

22    last status report, of the 1,031 that were determined to be

23    responsive only 62 were determined to be -- needed to be

24    referred to other government agencies, so I think that's

25    actually a relatively small fraction of the documents.

1          And as far as documents being classified, the vast

2     majority of the documents we're talking about here are

3     public source material.  They may have some metadata or

4     something that needs to be redacted, but it certainly

5     shouldn't be taking quite that long to review public source

6     material.

7          THE COURT:  Okay.  Well, let's move to that point.

8     One of the things that I've counseled many FOIA litigants to

9     try to do is to prioritize, in some respects, what you

10    really want.  I mean, there are 65,000 documents.  You know,

11    to get all of those, you're going to have to wait,

12    understandably.  Right?

13         MR. LIGHT:  Right.

14         THE COURT:  And so is there some way to eliminate

15    the need to review *New York Times* articles or articles

16    about -- or documents about the Nelson Mandela Airport or,

17    you know, certain custodians or certain subject matters?  Is

18    there any way for you and your client to work with the

19    agency to focus on what you're really interested in as

20    opposed to, you know, irrelevant materials that you're not

21    as much interested in?

22         MR. LIGHT:  Well, the request was specifically

23    limited to documents about Nelson Mandela the person, as

24    opposed to a bridge or a school named after him, so it does

25    seem, at least from the last status report, that only one-

1    sixth of the records that were reviewed are actually

2    responsive.  So if that's indicative, then we're maybe only

3    looking at one-sixth of the total universe of documents that

4    have been identified so far as things that actually need to

5    be reviewed for processing.

6         And of those, my client is actually very

7    interested in the public source material as well.  It is

8    significant what documents --

9         THE COURT:  What public source material the agency

10   maintains.

11        MR. LIGHT:  Right, exactly.

12        THE COURT:  Okay.  Well, that's fine, but that's

13   going to increase the number of responsive documents and,

14   accordingly, the amount of time he's going to have to wait

15   for full processing.

16        MR. LIGHT:  I understand that.  Your Honor, this

17   is not a case where we've asked for or been given expedited

18   processing.  These are records of an historical nature so

19   I'm not expecting it to be done in the next couple of

20   months, but, you know, if the time frame ends up exceeding

21   ten years, then I think we have a problem.

22        THE COURT:  Would the government like to add

23   anything?

24        MS. MERIWEATHER:  Oh, just one clarification with

25   respect to the open source material.  We don't have that

1    information.  It's not maintained in a way that makes it

2    obvious, upon a quick glance, that it is open source.  We

3    don't have copies of the newspapers, for example.  Instead,

4    it would be an agency document that would have headers and

5    footers that may have sensitive information, and then that

6    material would be embedded in the document; so unfortunately

7    there's not a quick way to segregate open source material

8    for some sort of expedited processing because it's as likely

9    as the other material to have information that has to be

10   reviewed for classification.

11            THE COURT:  What about this issue of duplicates?

12            Mr. Light, you say you want duplicates.  The

13   agency seems to be putting some time and effort into culling

14   out duplicates.

15            If you -- if the agency were to not try to

16   distinguish between duplicates, would that hasten the pace

17   at all?

18            MS. MERIWEATHER:  We think that -- we actually

19   think it would have the opposite effect because we would

20   have to process the document -- the document would be

21   processed more than one time if we reviewed -- when I say

22   "processed," I mean the more substantive review for the

23   applicability of FOIA exceptions if we're reviewing each

24   document more than once.  So although at the front end

25   screening for duplicates is an extra step, it saves time on

```
 1    the back end of the process.

 2              THE COURT:  Why do you want duplicates, Mr. Light?

 3              MR. LIGHT:  Your Honor, for scholars looking at

 4    material originating in agencies, there's context to the

 5    document in addition to the document itself.  So if there

 6    are two identical documents, and one is located in a series

 7    of articles about world leaders, that would be different

 8    than the exact same article being located in a file listing

 9    terrorists.

10              THE COURT:  Okay.  But, again, that may increase

11    the processing time.  According to the government, it will

12    increase the processing time.

13              MR. LIGHT:  It may.  It certainly doesn't seem to

14    me that it would be necessary to do the same substantive

15    review more than once.  I understand there might be the

16    administrative need to actually black out the material, but

17    once the determination's made of what's classified, what's

18    not, what should be withheld, what should not be withheld, I

19    don't see why that determination would need to happen all

20    over again.

21              THE COURT:  Well, the classification level or

22    determination could hinge on who possesses the document,

23    could it not?

24              MR. LIGHT:  I suppose that's possible.

25              THE COURT:  Ms. Meriweather?
```

1            MS. MERIWEATHER:  Yes.  And if we had not

2     identified it as a duplicate, we wouldn't know that there

3     had already been a review of that particular document to

4     determine what redactions had already been made.

5            MR. LIGHT:  Your Honor, if the classification

6     level could depend on who possesses it, then it would

7     definitely be in our interest to get the one that's the

8     least classified so there might be more releasable

9     information; so it would be helpful to us in that respect as

10    well.

11           THE COURT:  The FBI has already released a good

12    number of documents; is that right?

13           MR. LIGHT:  The FBI, it looks like, is almost done

14    with their submission --

15           THE COURT:  They're almost done.

16           MR. LIGHT:  -- and we haven't had any problems

17    with them or the pace of their release.

18           THE COURT:  Okay.  And the other two defendant

19    agencies --

20           MS. MERIWEATHER:  The other two --

21           THE COURT:  -- have concluded their review and

22    have withheld, and they're awaiting summary judgment.

23           MS. MERIWEATHER:  Yes, and we expect to file that

24    motion within the week.

25           THE COURT:  It would be partial summary judgment.

1          MS. MERIWEATHER:  Partial motion.

2          THE COURT:  Okay.

3          Okay.  I'm not going to order the government to

4     review for relevancy any more than the 4,000 per month that

5     it has indicated that it's prepared to do, but I'll hold you

6     to that number, okay?  And I would order that Mr. Shapiro's

7     request be given more -- equal, if not more, attention than

8     the other requests in the queue, and that the agency proceed

9     with all due -- all deliberate speed with respect to his

10    request.  But I'm not going to set a specific number on it.

11         I'd like a status report within 90 days or in 90

12    days --

13         MS. MERIWEATHER:  Okay.

14         THE COURT:  -- and every 90 days thereafter.  And

15    if you want another status, let us know, and we'll hold one,

16    if necessary.  Okay?

17         And Mr. Light, if you reconsider the need to

18    prioritize -- if you're not getting materials that you think

19    are, you know, the most fruitful for Mr. Shapiro's scholarly

20    purpose, think about ways to work with the government to

21    identify categories of documents or to otherwise prioritize

22    the search to get good stuff sooner and leave the not-so-

23    great stuff until later.  Okay?

24         MR. LIGHT:  And is Your Honor making a ruling with

25    respect to the number of documents to be reviewed for

```
 1    release each month?

 2              THE COURT:  No.

 3              MR. LIGHT:  Okay.

 4              THE COURT:  We're making a ruling on the 4,000 for

 5    relevancy review.

 6              MR. LIGHT:  Okay.

 7              THE COURT:  And we are going to leave it to

 8    the government's good judgment and ability to process

 9    Mr. Shapiro's request consistent with its other obligations,

10    but we will expect that the pace be kept reasonably high.

11    Okay?

12              This is an important request.  It's a matter of

13    public interest.  The Court credits the scholarly research

14    that Mr. Shapiro is doing, and it's worthy of the agency's

15    attention.  But I'm not going to set a specific limit for

16    processing and release.  Okay?

17              MS. MERIWEATHER:  Thank you, Your Honor.

18              THE COURT:  And we'll deal with this in 90 days,

19    if necessary.

20              MR. LIGHT:  Okay.

21              THE COURT:  Okay?

22              MR. LIGHT:  Thank you, Your Honor.

23              MS. MERIWEATHER:  Thank you.

24              THE COURT:  Okay.  Anything else?

25              MR. LIGHT:  No, Your Honor.
```

1          THE COURT:  Okay.  We're adjourned.

2                    (Whereupon the hearing was

3                    concluded at 11:21 a.m.)

4

5            **CERTIFICATE OF OFFICIAL COURT REPORTER**

6

7          I, LISA A. MOREIRA, RDR, CRR, do hereby

8     certify that the above and foregoing constitutes a true and

9     accurate transcript of my stenographic notes and is a full,

10    true and complete transcript of the proceedings to the best

11    of my ability.

12       Dated this 3rd day of August, 2015.

13

14                              /s/Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
15                              United States Courthouse
                                Room 6718
16                              333 Constitution Avenue, NW
                                Washington, DC 20001
17

18

19

20

21

22

23

24

25