UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RYAN NOAH SHAPIRO<br><br>Plaintiff,<br><br>v.<br><br>CENTRAL INTELLIGENCE AGENCY, et al.,<br><br>Defendants. | ) | Civil Action No. 14-19 CRC |

FBI'S MOTION TO DISMISS OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendant, the United States Department of Justice ("DOJ"),[1] by and through counsel, hereby moves, pursuant to Fed. R. Civ. P. 12(b)(1) and (6), to dismiss the First Amended Complaint (hereinafter, "Complaint") (ECF No. 9) in this Freedom of Information Act ("FOIA") action. In the alternative, the FBI moves for summary judgment in its favor, pursuant to Fed. R. Civ. P. 56, because there is no genuine issue as to any material fact and the FBI is entitled to judgment as a matter of law.

[1] The DOJ is sued solely as a result of a Freedom of Information Act request submitted to the Federal Bureau of Investigation ("FBI"). Complaint, ¶¶ 21, 35-39. For ease of reference, this Defendant shall typically be referred to as the FBI.

The Court is respectfully referred to the memorandum, declarations, and statement of material facts also submitted in support of this motion.[2]

Respectfully submitted,

CHANNING D. PHILLIPS, DC Bar #415793
United States Attorney

DANIEL F. VAN HORN, DC Bar #924092
Chief, Civil Division

By: ______________________________ /s/
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney

---

[2] Certain materials are being submitted to the Court in camera and ex parte. See 5 U.S.C. § 552(a)(4)(B) ("the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section"). Where exhibits to the declarations contained Plaintiff's personal information, it has been redacted pursuant to Local Civ. R. 5.4(f).

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RYAN NOAH SHAPIRO<br><br>Plaintiff,<br><br>v.<br><br>CENTRAL INTELLIGENCE AGENCY, et al.,<br><br>Defendants. | ) | Civil Action No. 14-19 CRC |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF FBI'S MOTION TO DISMISS OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

## INTRODUCTION

This case arises under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and pertains to several requests Plaintiff submitted to the FBI, the Central Intelligence Agency, and the Department of Defense and the National Security Agency. This motion concerns Plaintiff's request to the FBI and seeks judgment in favor of the United States Department of Justice on all claims.[1]

[1] As the FBI prepared its summary judgment declaration and sought out justifications and/or declarations from other government agencies ("OGAs"), it was advised by one or more OGAs that additional referrals and consultations may still be forthcoming from them. Accordingly, the incoming consultation and referral documents have not been processed in the FBI's releases and upon receipt must undergo review and processing, and any withheld information from these anticipated consultations will need to be provided in a supplemental Vaughn Declaration. Thus, the FBI's current declaration will only encompass the universe of documents identified in the 18 releases made thus far. See Declaration of David M. Hardy ("Hardy Decl."), ¶ 105. The FBI does not believe that these documents will forestall summary judgment in its favor, however, because Department of Justice

Aside from fees and costs, the only specific relief sought by Plaintiff is declaratory relief, seeking that the Court: "Declare Defendants' failure to comply with FOIA to be un unlawful [and] Declare that Plaintiff is entitled to expedited processing of his FOIA request." Complaint at 9. Because the FBI has now processed Plaintiff's request for records and released the portions not subject to withholding under the FOIA, his requests for relief are moot. See Hardy Decl., ¶ 6 (noting that Plaintiff's request for expedited processing was granted by December 19, 2013); Amended Complaint (ECF No. 9), ¶ 37. Where information has been withheld, Defendants have satisfactorily documented the proper withholding of that information under the FOIA. See 5 U.S.C. § 552(b)(1), (3), (5), (6), (7(A), (7)(C), (7)(D), (7)(E) and (7)(F). See Hardy Decl., ¶¶ 4, 35, 103-04.

---

regulations provide that "[i]n determining which records are responsive to a request, a component ordinarily will include only records in its possession as of the date the component begins its search for them." 28 C.F.R. § 16.4. See also Hardy Decl., ¶ 14 (noting that the FBI had previously noted that records which may have been responsive to his request were destroyed and/or archived with the National Archives and Records Administration prior to the initiation of his request). The FBI's search for documents began by December 2013. See Hardy Decl., ¶ 6.

A. Legal Standards

In a FOIA action, the courts have jurisdiction only when an agency has improperly withheld agency records. 5 U.S.C. § 552(a)(4)(B). It is well established that under the FOIA, "once the records are produced the substance of the controversy disappears and becomes moot since disclosure which the suit seeks has already been made." Crooker v. United States State Dep't, 628 F.2d 9, 10 (D.C. Cir. 1980); see also Boyd v. Criminal Div. of U.S. Dep't of Justice, 475 F.3d 381, 385 n.1 (D.C. Cir. 2007) ("Because the government advised during oral argument that these documents have been released to Boyd, Amicus's challenge to the invocation of Exemption 3 is moot.") (citing Perry v. Block, 684 F.2d 121, 125 (D.C. Cir. 1982)). Although Defendants do not dispute that the Court has jurisdiction to decide its jurisdiction, and thus whether documents have been properly withheld, the mootness of the case, at a minimum as to the information provided after the Complaint was filed, means that there is no longer a case or controversy subject to the Court's jurisdiction, at least as to the claim seeking to order the Defendants to process Plaintiff's request and seeking release of the information now released to Plaintiff. See Bayala v. U.S. Dep't of Homeland Security, No. 14-5279, slip op. at 4-5, ___ F.3d ___, 2016 WL 3524098 at *2 (D.C. Cir. June 28, 2016) (FOIA case is moot with regard to the documents that were released even where other issues remained to be decided); Arizonans For Official English v. Arizona, 520 U.S.

43, 64-67 (1997) (to qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed).

Although Plaintiff alleges in the March 25, 2014 Amended Complaint that materials were not properly processed as of that date, see Amended Complaint, ¶¶ 10-11, 21, 39, disclosures were subsequently made. See, e.g., Declaration of David M. Hardy, ¶¶ 4-18. As reflected herein and in the declarations submitted to the Court, the disclosures satisfy the FBI's obligation under the FOIA and Plaintiff's claims, insofar as he has sought processing and release of the materials now made available to him, are moot. Bayala, supra, slip op. at 4-5, 2016 WL 3524098 at *2.

In a FOIA action, summary judgment is appropriate when, as here, the pleadings, together with the declarations, demonstrate that "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Washington Post Co. v. U.S. Dep't of Health and Human Services, 865 F.2d 320, 325 (D.C. Cir. 1989). As the Supreme Court has declared, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

An agency satisfies the summary judgment requirements in a FOIA case by showing that each document was produced, not withheld, is unidentifiable, or is exempt from disclosure. Weisberg v. U.S. Dep't of Justice, 627 F.2d 365, 368 (D.C. Cir. 1980). To meet its burden, the defendant may rely on affidavits or declarations and other evidence by the agency which show that the documents are exempt from disclosure.[4] Summary judgment may be awarded to an agency in a FOIA or Privacy Act case solely on the basis of agency affidavits or declarations if the "affidavits are 'relatively detailed, non-conclusory, and not impugned' by evidence . . . of bad faith on the part of the agency." Public Citizen, Inc. v. Dep't of State, 100 F.Supp. 2d 10, 16 (D.D.C. 2000) (quoting McGhee v. Central Intelligence Agency, 697 F.2d 1095, 1102 (D.C. Cir. 1983)). Once the Court determines that the declarations are sufficient, it need not inquire further. Students Against Genocide v. Dep't of State, 257 F.3d 828, 833 (D.C. Cir. 2001). Because Defendants here have produced or properly withheld information (at times properly withholding information regarding even the very existence or non-existence of responsive documents), Plaintiff's Amended

[4] For purposes of summary judgment, an agency's decision to withhold information from a FOIA requester is subject to de novo review by the courts. Hayden v. National Security Agency Cent. Sec. Serv., 608 F.2d 1381, 1384, 1386 (D.C. Cir. 1979).

Complaint should be dismissed or summary judgment entered in favor of Defendants.

B. Defendants Have Satisfied the FOIA.

The Searches

The FBI has explained how it went about identifying the logical places likely to have records responsive to Plaintiff's FOIA request. The FBI has explained in detail the record systems and search capabilities available to it. Hardy Decl., ¶¶ 19-28. And, the FBI has explained how it accomplished the searches of those systems for records responsive to Plaintiff's FOIA request. Hardy Decl., ¶¶ 29-34. Because these search methods are reasonably likely to identify records responsive to Plaintiff's request, the FBI has properly supported this aspect of summary judgment. Hardy Decl., ¶¶ 5-34 and fn.14; Def. SMF, ¶¶ 1-79.

The Withholdings

As reflected in the declarations and exhibits submitted on behalf of the FBI, the FBI has properly relied upon various exemptions where it has withheld responsive information subject to the FOIA. The FBI properly relies on exemptions, which are contained in the following sections of the FOIA: 5 U.S.C. § 552(b)(1), (b)(3), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), (b)(7)(E) and (b)(7)(F).[5]

[5] Exemption 7(F) was relied upon by the Drug Enforcement

See Hardy Decl., ¶¶ 35-104; see also *Ex Parte In Camera* Declaration of David M. Hardy.

A. Information Under 5 U.S.C. § 552(b)(1)

Exemption 1 of FOIA protects from disclosure national security information concerning the national defense or foreign policy, provided that it has been properly classified in accordance with the substantive and procedural requirements of an executive order. 5 U.S.C. § 552(b)(1). The applicable executive order currently in effect is Executive Order No. 13526. Executive Order No. 13526 establishes as bases for classification several widely recognized information categories. See Executive Order 13526; Hardy Decl., ¶¶ 39-38. See Larson v. Dep't of State, 565 F.3d at 861 (acknowledging that Exemption 1 protects information properly classified under the national security executive order then in effect); Morley v. CIA, 508 F.3d 1108, 1123-24 (D.C. Cir. 2007) (same); Wolf v. CIA, 473 F.3d 370, 373 ¶ n.3 (D.C. Cir. 2007) (same); Campbell v. DOJ, 164 F.3d 20, 29 (D.C. Cir. 1998) (same).

Affidavits asserting classification in accordance with Exemption 1 are entitled to substantial weight. Krikorian v. Dep't

---

Administration ("DEA") to withhold information from a single sentence on the document numbered Mandela-1216. That information, although not a name, could be used to identify a third-party individual and releasing it could reasonably be expected to endanger the life or physical safety of the individual. See Hardy Decl., ¶ 103.

of State, 984 F.2d 461, 464 (D.C. Cir. 1993); Taylor v. Dep't of the Army, 684 F.2d 99, 109 (D.C. Cir. 1982); Baez v. Dep't of Justice, 647 F.2d 1328, 1334 (D.C. Cir. 1980); Halkin v. Helms, 598 F.2d 1, 9 (D.C. Cir. 1978); Ray v. Turner, 587 F.2d 1187, 1194-1195 (D.C. Cir. 1978). Summary judgment with respect to Exemption 1 is appropriate where the agencies' affidavits are reasonably specific and there is no evidence of bad faith. Halperin v. CIA, 629 F.2d 144, 148 (D.C. Cir. 1980). Courts have recognized that the articulation of threatened harm always will be speculative and a showing of actual harm is unnecessary. Halperin, 629 F.2d at 149. And, Courts normally will defer to the expert opinion of the agency, because they "lack the expertise necessary to second-guess such agency opinions in the typical national security FOIA case." Id.

In this case, the information has been withheld under Exemption 1 because it constitutes Intelligence Activities, Sources, and Methods (E.O. 13526 § 1.4(c)) [cited, at times, in conjunction with (b)(3) and/or (b)(7)(E)] and because it constitutes information related to foreign relations or foreign activities. Hardy Decl., ¶¶ 38, 43. Disclosure of the information withheld under Exemption 1 reasonably could be expected to cause serious damage to the national security. Hardy Decl., ¶¶ 39-52 and fn. 18; Executive Order 13526, § 1.4; Def. SMF, ¶¶ 80-90.

The information withheld under Exemption 1 can be described on

the public record accurately as warranting classification at the SECRET level pursuant to E.O. 13526 § 1.4(c); it constitutes, intelligence activities (including covert action), intelligence sources or methods, or cryptology and pursuant to § 1.4(d) of that Executive Order, in that it concerns foreign relations or foreign activities. Hardy Decl., ¶ 43; see also Hardy Decl., ¶¶ 39-52.

In sum, the information to which Exemption 1 has been asserted is specifically authorized by Executive Order 13526 to be kept secret, and the information is properly classified. See Hardy Decl., ¶¶ 38, 39-52 and fn.18; Def. SMF, ¶¶ 80-90.

### B. The FBI Has Properly Withheld Certain Requested Information Under 5 U.S.C. § 552(b)(3).

Under Exemption 3, the FOIA's disclosure provision "does not apply to matters that are . . .

> (3) specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

5 U.S.C. § 552(b)(3). See Cuban v. SEC, 795 F.Supp. 2d 43, 62-63 (D.D.C. 2011); Ray v. Turner, 587 F.2d 1187, 1191 (D.C. Cir. 1978).

The FBI has also relied on the protection afforded to intelligence sources and methods by 50 U.S.C. § 3024(i)(1). Specifically, the FBI withheld information pursuant to Section

102A(i)(1) of the National Security Act of 1947 ("NSA"), as amended by the Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), 50 U.S.C. § 3024(i)(1), which provides that the Director of National Intelligence ("DNI") "shall protect from unauthorized disclosure intelligence sources and methods." Hardy Decl, ¶ 54. This provision of the National Security Act provides that is a withholding statute within the meaning of FOIA Exemption 3. See Mobley v. CIA, 924 F. Supp. 2d 24, 53-54 (D.D.C. 2013) (quoting 50 U.S.C. § 403–1(i)(1)), aff'd, 806 F.3d 568 (D.C. Cir. 2015);[6] see also CIA v. Sims, 471 U.S. 159 (1985).

As relevant to 5 U.S.C. § 552(b)(3)(B), the National Security Act of 1947 was enacted before the date of enactment of the OPEN FOIA Act of 2009. Id. On its face, this federal statute leaves no discretion to agencies about withholding from the public information about intelligence sources and methods. 50 U.S.C. § 3024(i)(1); Hardy Dec., ¶ 70. Thus, the protection afforded to intelligence sources and methods by 50 U.S.C. § 3024(i)(1) is absolute. See CIA *v.* Sims, 471 U.S. 159.

In order to fulfill its obligation of protecting intelligence sources and methods, the DNI is authorized to establish and implement guidelines for the Intelligence Community ("IC") for the

[6] 50 U.S.C. § 403(i)(1) is now codified at 50 U.S.C. § 3024(i)(1). Hardy Decl., ¶ 54 fn.19.

classification of information under applicable laws, Executive Orders, or other Presidential Directives, and for access to and dissemination of intelligence. 50 U.S.C. § 3024(i)(1); Hardy Decl., ¶ 55. In implementing this authority, the DNI promulgated Intelligence Community Directive 700, which provides that IC elements elements shall protect "national intelligence and intelligence sources and methods and activities from unauthorized disclosure."[7] The FBI is one of 17 member agencies comprising the IC, and as such must protect intelligence sources and methods. Hardy Decl., ¶ 55. In implementing this authority and Executive Order 12,333, the DNI promulgated Intelligence Community Directive 700, which provides that that IC elements shall protect "national intelligence and intelligence sources and methods and activities from unauthorized disclosure." The FBI is one of 17 member agencies comprising the IC, IC, and as such must protect intelligence sources and methods. Hardy Decl., ¶ 55.

Given the mandate to protect the IC's sources and methods of gathering intelligence, the FBI has determined that intelligence sources and methods would be revealed if any of the withheld information is disclosed to Plaintiff. Hardy Decl., ¶ 56.

---

[7] Intelligence Community Directive (ICD) 700, date June 7 2012, at ¶ 2a. Hardy Decl., ¶ 55 fn.20; Def. SMF, ¶ 96.

Therefore, the FBI is prohibited from disclosing such information under § 3024 (i)(1).[8] Notably, § 3024 (i)(1) protects sources and methods regardless of whether they are classified. See Sims, 471 U.S. U.S. at 176. The FBI also relied on Exemptions 1 and 7(E) to protect information in some of these records. Hardy Decl., ¶ 57.[9]

Similarly, the FBI, relying on declarations provided by the Central Intelligence Agency ("CIA") and Department of Defense ("DOD") has properly asserted withholding statutes codified in the National Security Act as well as codified at 50 U.S.C. § 3507 and 10 U.S.C. § 424 to withhold information under Exemption 3. See Hardy Decl., ¶¶ 53-57, 101 and Exhibit D (Shiner Decl.), ¶¶ 34-37 & Exhibit E (Williams Decl.), ¶¶ 19-20; Physicians for Human Rights v. U.S.

[8] Although § 3024(i)(1) does not impose a requirement to articulate harm, disclosure of this information presents a bona fide opportunity for individuals to develop and implement countermeasures, resulting in the loss of significant intelligence information, sources, and methods relied upon by national policymakers and the IC to safeguard national security. Hardy Decl., ¶ 56 fn.21, see also Shiner Decl., ¶ 37; Williams Decl., ¶ 21.

[9] The FBI is asserting Exemption 3 in this case, at times, in conjunction with Exemptions 1 and 7(E) to protect information that would reveal intelligence sources and methods. Hardy Decl., ¶ 57. In some instances, information would reveal classified intelligence sources and methods protected by Exemption 1; and in some instances, information was protected under Exemption 7(E) because unclassified intelligence sources and methods were employed as law enforcement techniques, procedures or guidelines and thus would qualify as both an intelligence source and method under Exemption 3 and a law enforcement technique under Exemption 7(E). Hardy Decl., ¶ 57.

Dep't of Def., 675 F. Supp. 2d 149, 160 (D.D.C. 2009) (recognizing that the relevant data was properly protected under 10 U.S.C. § 424, which authorizes the withholding of information relating to "the organization or any function of an organization of the Department of Defense," such as the DIA); Sack v. CIA, 49 F. Supp. 3d 15, 21 (D.D.C. 2014) (noting that Section 6 of the Central Intelligence Act, 50 U.S.C. § 3507, formerly 50 U.S.C. § 403g, protects from disclosure "the organization, functions, names, official titles, salaries, or numbers of personnel employed by the [CIA.]" and qualifies as an Exemption 3 statute) (citing Weissman v. CIA, 565 F.2d 692, 694 (D.C. Cir. 1977)). Thus, the FBI has properly invoked Exemption 3, 5 U.S.C. § 552(b)(3).

### C. Information Under 5 U.S.C. § 552(b)(5) and the Deliberative Process Privilege.

Exemption 5 of the Freedom of Information Act protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5);[10] see also U.S. Dep't of

[10] On June 30, 2016, the President signed into law the FOIA Improvement Act of 2016, which sets forth some additional requirements that the a government agency must meet in order to withhold materials under 5 U.S.C. § 552(b)(5). Those provisions, however, apply only to FOIA requests made after June 30, 2016. See FOIA Improvement Act of 2016, § 6. Plaintiff's request was submitted

Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001) (holding that a record may be withheld under Exemption 5 only if "its source [is] ... a [g]overnment agency, and it ... fall[s] within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it").

One commonly invoked privilege incorporated within Exemption 5 is the deliberative process privilege, the general purpose of which is to "prevent injury to the quality of agency decisions." NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 151 (1975). Three policy purposes consistently have been held to constitute the bases for this privilege: (1) to encourage open, frank discussions on matters of policy between subordinates and superiors; (2) to protect against premature disclosure of proposed policies before they are actually adopted; and (3) to protect against public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's action. See, e.g., Russell v. Dep't of the Air Force, 682 F.2d 1045, 1048 (D.C. Cir. 1982); Coastal States Gas Corp. v. DOE, 617 F.2d 854, 866 (D.C. Cir. 1980); Jordan v. DOJ, 591 F.2d 753, 772-73 (D.C. Cir. 1978) (*en banc*); Kidd v. DOJ, 362 F. Supp. 2d 291, 296 (D.D.C. 2005) (protecting documents on basis that disclosure would "inhibit drafters from

---

in 2013. Amended Complaint, ¶ 21.

freely exchanging ideas, language choice, and comments in drafting documents") (internal quotation marks omitted); Heggestad v. DOJ, 182 F.Supp. 2d 1, 12 (D.D.C. 2000) (protecting memoranda containing recommendations); see also National Security Archive, v. CIA, 752 F.3d 460, 462-65 (D.C. Cir. 2014).

> "The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery," and its purpose "is to enhance 'the quality of agency decisions' by protecting open and frank discussion among those who make them within the Government." Klamath, 532 U.S. at 8–9, 121 S.Ct. 1060, quoting NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 151, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975), and citing EPA v. Mink, 410 U.S. 73, 86–87, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). Thus, the privilege only "protects agency documents that are both predecisional and deliberative." Judicial Watch, Inc. v. FDA, 449 F.3d 141, 151 (D.C. Cir. 2006); accord McKinley v. Bd. of Governors of Fed. Reserve Sys., 647 F.3d 331, 339 (D.C. Cir. 2011). "[A] document [is] predecisional if 'it was generated before the adoption of an agency policy' and deliberative if 'it reflects the give-and-take of the consultative process.' " Judicial Watch, Inc. v. FDA, 449 F.3d at 151, quoting Coastal States Gas Corp. v. U.S. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980).

Cause of Action v. Internal Revenue Serv., 125 F. Supp. 3d 145, 158-59 (D.D.C. 2015). Thus, it is clear that Exemption 5 incorporates the deliberative process privilege. Public Employees for Environmental Responsibility v. U.S. Section, International Boundary and Water Com'n, U.S.-Mexico, 740 F.3d 195, 201-02 (D.C. Cir. 2014).

Here, the FBI has employed Exemption 5 and the deliberative process privilege for withholding a ten-page draft Operations Plan

(pages marked Mandela 832-841). Hardy Decl., ¶ 61 and fn.23. This draft Operations Plan meets the threshold requirement because it is an intra-agency document and pre-dates the final decision. Hardy Decl., ¶ 61. This plan concerns preparations by FBI Pretoria Legat to support a U.S. Delegation to the South African state funeral for former South African President Nelson Mandela (See Mandela-829 for further description) and is not the final plan. Hardy Decl., ¶ 61. It is labeled on its cover as a "draft," predates the death of Nelson Mandela, and makes numerous references to additional information that is sought or will need to be included upon receipt of additional funeral arrangement details. Hardy Decl., ¶ 61. Accordingly, the FBI appropriately asserted Exemption 5.

D. The FBI Has Properly Withheld Certain Requested Records Under 5 U.S.C. § 552(b)(6) and (7)(C)

Exemption B(6) of the FOIA protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "The Supreme Court has interpreted the phrase 'similar files' to include all information that applies to a particular individual." Lepelletier v. FDIC, 164 F.3d 37, 46 (D.C. Cir. 1999), (emphasis supplied) (quoting Department of State v. Washington Post Co., 456 U.S. 595, 602 (1982)). The Court has also emphasized that "both the common law and the literal understanding of privacy encompass the individual's control of information concerning his or her person."

U.S. Department of Justice v. Reporters Committee for Freedom of the Press, 489 U.S. 749, 763 (1989).

In order to determine whether there would be a "clearly unwarranted invasion of personal privacy," the court must balance the interests of protecting "an individual's private affairs from unnecessary public scrutiny," and "the public's right to governmental information." Lepelletier, 164 F.3d at 46 (interior quotation marks omitted) (citing United States Dept. of Defense Dept. of Military Affairs v. FLRA, 964 F.2d 26, 29 (D.C. Cir. 1992) (quoting Department of Air Force v. Rose, 425 U.S. 352, 372 (1976))). In determining how to balance the private and public interests involved, the Supreme Court has sharply limited the notion of "public interest" under the FOIA: "[T]he only relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" Lepelletier, 164 F.3d at 46 (editing by the court, emphasis supplied, interior quotation marks omitted) (quoting United States Dept. of Defense v. FLRA, 510 U.S. 487, 497 (1994)); see also Reporters Committee, 489 U.S. at 773. Information that does not directly reveal the operation or activities of the federal government "falls outside the ambit of the public interest that the FOIA was enacted to serve." Id. at 775. Further, "something, even a modest privacy interest, outweighs

nothing every time." National Ass'n of Retired Fed. Employees v. Horner, 879 F.2d 873, 879 (D.C. Cir. 1989); but see Lepelletier, 164 F.3d at 48 (in extraordinary circumstance where the individuals whose privacy the government seeks to protect have a "clear interest" in release of the requested information, the balancing under Exemption 6 must include consideration of that interest).

Here, the FBI applied Exemption B(6)in conjunction with Exemption 7(C) to withhold information from law enforcement files, including: 1) names and identifying information of FBI Special Agents ("SAs") and support personnel who were responsible for conducting, supervising, and/or maintaining the investigative activities; 2) the names and/or identifying information of personnel from non-FBI federal government agencies who provided information to or otherwise assisted the FBI in these investigations; 3) the names and identifying information of local law enforcement employees who were acting in their official capacities and aided the FBI in the law enforcement investigative activities; 4) the names and identifying information[11] of third parties who were merely mentioned in the criminal investigative files; 5) the names and/or identifying

[11] As used in the Hardy Declaration, the term "identifying information" may include, but is not limited to, dates of birth, social security numbers, addresses, employment and /or position, telephone numbers, and/or other personal information. Hardy Decl. ¶ 72 and fn.28.

information of third parties who were of investigative interest to the FBI; and 6) the names and identifying information of individuals who were interviewed and/or provided information to the FBI during the course of investigations Hardy Decl., ¶¶ 65-75. In each instance where the FBI employed Exemption B(6) or B(7)(C), the FBI weighed the adverse effects of the release of the information to the individuals involved and the benefit to the public that disclosure could be expected to provide. Hardy Decl., ¶¶ 66-75 and fn.24. In each instance, the benefits to production of the information did not suffice to overcome the privacy interests in those individuals whose identifying information was at issue. Id.

The FBI therefore properly employed the exemptions found in 5 U.S.C, § 552(b)(6) and (7)(C). Hardy Decl., ¶¶ 65-75 and fns.24-31.

E. The FBI Has Properly Withheld Certain Requested Records Under 5 U.S.C. § 552(b)(7)

Law Enforcement Records

To invoke any of the subsections of Exemption 7, an agency must first demonstrate that the records were "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7); see John Doe Agency v. John Doe Corp., 493 U.S. 146, 153 (1989); Pub. Employees for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-

Mexico, 740 F.3d 195, 202 (D.C. Cir. 2014).[12]

> "[T]he term 'compiled' in Exemption 7 requires that a document be created, gathered, or used by an agency for law enforcement purposes at some time before the agency invokes the exemption." [Pub. Employees for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.- Mexico, 740 F.3d] at 203 (citing John Doe Agency [v. John Doe Corp., 493 U.S. 146, 155, 110 S.Ct. 471 (1989)]. "Law enforcement entails more than just investigating and prosecuting individuals *after* a violation of the law," id. (emphasis in original), and " 'includes ... proactive steps designed to prevent criminal activity and to maintain security.' " Id. (alteration in original) (quoting Milner [v. Dep't of Navy, 562 U.S. 562, 131 S.Ct. 1259, 1272 (2011)] (alito, J., concurring)).

Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec., 777 F.3d 518, 522-23 (D.C. Cir. 2015), cert. denied sub nom. Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec., 136 S. Ct. 876, 193 L. Ed. 2d 710 (2016).

The records sought by Plaintiff in this instant action for which the FBI has asserted one of the exemptions in 5 U.S.C. § 552(b)(7) were compiled for law enforcement purposes. See Hardy Decl., ¶¶ 62-64; Gamboa v. Executive Office for United States Attorneys, 65

[12] This Court has repeatedly held that in order to satisfy this threshold requirement, criminal law enforcement agencies need only show that the records at issue are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement duty of the agency. Keys v. Dep't of Justice, 830 F.2d 337, 340 (D.C. Cir. 1987) (citing with approval Pratt v. Webster, 673 F.2d 408, 420-21 (D.C. Cir. 1982)); Shaw v. FBI, 749 F.2d 58, 63-64 (D.C. Cir. 1984) (mere existence of plausible criminal reason to investigate shifts burden to plaintiff to disprove Exemption 7's applicability); Binion v. Dep't of Justice, 695 F.2d 1189, 1194 (9th Cir. 1983) (only "rational nexus" between criminal law enforcement agency's duties and document need be shown).

F. Supp. 3d 157, 169 (D.D.C. 2014) (OCDETF case initiation form was compiled for law enforcement purposes within the scope of Exemption 7).

Having established that the records at issue qualify as Exemption 7 "law enforcement" records, the remaining considerations under 5 U.S.C. § 552(b)(7) are satisfied as follows.

1. The FBI Has Properly Withheld Certain Requested Records Under 5 U.S.C. § 552(b)(7)(A).

> FOIA exemption 7(A). . . protects from disclosure "records or information compiled for law enforcement purposes" if disclosure "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). To justify withholding information pursuant to Exemption 7(A), the agency must demonstrate that "disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated." Mapother v. U.S. Dep't of Justice, 3 F.3d 1533, 1540 (D.C. Cir. 1993).

Adionser v. Dep't of Justice, 811 F. Supp. 2d 284, 297–98 (D.D.C. 2011), aff'd in part sub nom. Adionser v. U.S. Dep't of Justice, No. 11-5093, 2012 WL 5897172 (D.C. Cir. Nov. 5, 2012).

In this case, the FBI has asserted Exemption (b)(7)(A) in a limited fashion to protect the names, personal identifying information, file numbers, and activities of third-party subjects of pending FBI investigations among the responsive documents. The release of the names, identifying information, file numbers, and activities of third parties of on-going FBI investigations could result not only in the acknowledgment of the existence of the investigations, but also expose the identity of suspects, thereby

jeopardizing the investigations. The FBI has applied Exemption (b)(7)(A) to protect the names, personal identifying information, file numbers, and activities of third parties of these open investigations on three pages: Mandela 520-521, and Mandela 1160. Mandela-520-521 concerns a fugitive from justice in an ongoing domestic terrorism case who has not yet apprehended. Mandela-1160 concerns the subject of an ongoing domestic terrorism investigation. Hardy Decl., ¶ 77. In doing so, it has properly relied on Exemption 7(A). Id.; Adionser v. Dep't of Justice, 811 F. Supp. 2d at 298.

2. The FBI Has Properly Withheld Certain Requested Records Under 5 U.S.C. § 552(b)(6) and (7)(C).

Having established that the records at issue qualify as Exemption 7 records, the remaining consideration under Exemption 7(C) is whether their release "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).[5] In assessing the invocation of Exemption 7(C), the Supreme Court has employed a two-part test: First, whether disclosure could reasonably be expected to constitute an invasion of personal privacy; and second, whether invasion of this interest would be unwarranted. Department of Justice v. Reporters Committee for Freedom of the Press, 489 U.S. 749, 762, 771 (1989). In determining whether or not the invasion of privacy would be

[5] Exemption B(7)(C), therefore, establishes a less demanding test to withhold personal information than Exemption B(6).

warranted, the invasion of personal privacy must be balanced against the public interest in disclosure. Id. at 772-73; see Beck v. Department of Justice, 997 F.2d 1489, 1491 (D.C. Cir. 1993). The FOIA plaintiff bears the burden of establishing for the Court that the public interest in disclosure is both significant and compelling in order to overcome legitimate privacy interests. Senate of Puerto Rico v. Department of Justice, 823 F.2d 574, 588 (D.C. Cir. 1987).

The Supreme Court has instructed: "[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person." Reporters Comm., 489 U.S. at 763. With regard to law enforcement files, this Court has concluded: "It is surely beyond dispute that 'the mere mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation.'" Fitzgibbon v. CIA, 911 F.2d 755, 767 (D.C. Cir. 1990) (quoting Branch v. FBI, 658 F. Supp. 204, 109 (D.D.C. 1987)); see Computer Professionals for Social Responsibility v. United States Secret Service, 72 F.3d 897, 904 (D.C. Cir. 1996).

In contrast to other FOIA exemptions, Exemption 7(C) does not "require a balance tilted emphatically in favor of disclosure," but rather "recognizes the stigma potentially associated with law enforcement investigations and affords broader privacy rights to suspects, witnesses, and investigators." Bast v. Department of Justice, 665 F.2d 1251, 1254 (D.C. Cir. 1981). Here, Plaintiff seeks

official information from government law enforcement files that would identify personal information about third parties. Hardy Decl., ¶¶ 65-75 and fns.24-31.[13]

This Court has previously held that "[t]hose who cooperated with law enforcement should not pay the price of full disclosure of personal detail." Lesar v. Dep't of Justice, 636 F.2d 472, 488 (D.C. Cir. 1980); see also Stone v. FBI, 727 F. Supp. 662 (D.D.C. 1990) (recognizing law enforcement agents' bona fide interest in privacy and noting special danger and animosity engendered by release of names). The government is not, by virtue of a witness' willingness to testify, required to release other, unrelated, information regarding this individual. See Jones v. FBI, 41 F.3d 238, 247 (6th Cir. 1994) ("We must reject plaintiff's argument that certain agents waived 7(C) protection by testifying at plaintiff's habeas proceeding. Exemption 7(C) leaves the decision about publicity--whether and how much to reveal about herself--in the power of the individual whose privacy is at stake."); Brown v. FBI, 658 F.2d 71, 75 (2d Cir. 1981) (Applying Exemption (b)(6), the Court ruled that the appellant's "assertion that, by testifying, [the crime victim] has waived her right to privacy is without foundation in law

[13] The fact that an individual's identity may be known to Plaintiff does not lessen the individual's privacy interests in the files. See Weisberg v. Department of Justice, 475 F.2d 1476, 1491 (D.C. Cir. 1984).

or logic.”).

Thus, there is abundant support for the FBI’s determination that the information withheld pursuant to Exemption 7(C) (and Exemption B(6))[14] was properly withheld.

3. The FBI Has Properly Withheld Certain Requested Records Under 5 U.S.C. § 552(b)(7)(D).

The FBI has also withheld certain information, relying on 5 U.S.C. § 552(b)(7)(D), which provides:

> could reasonably be expected to disclose the identity of a confidential source, including a State, local or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by a criminal law enforcement agency conducting a lawful national security intelligence investigation, information furnished by a confidential source.

5 U.S.C. § 552(b)(7)(D).

> There is no general “presumption that a source is confidential within the meaning of [FOIA] Exemption 7(D) whenever [a] source provides information [to a law enforcement agency] in the course of a criminal investigation.” DOJ v. Landano, 508 U.S. 165, 181, 113 S.Ct. 2014, 124 L.Ed.2d 84 (1993). Rather, a source’s confidentiality must be determined on a case-by-case basis. Id. at 179–80, 113 S.Ct. 2014. “A source is confidential within the meaning of [E]xemption 7(D) if the source ‘provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred.’” Williams v. FBI,

[14] The categories of information withheld under Exemption B(7)(C) are described above in discussing the applicability of Exemption B(6). See also Hardy Decl., ¶¶ 65-75 and fns.24-31.

69 F.3d 1155, 1159 (D.C.Cir.1995) (per curiam) (quoting Landano, 508 U.S. at 170–74, 113 S.Ct. 2014).

Petrucelli v. Dep't Of Justice, 51 F. Supp. 3d 142, 168-69 (D.D.C. 2014) (concluding that an informant file number, confidential symbol number and confidential source file number all properly withheld under Exemption 7(D)) (appeal pending), see also id. at 171 (EOUSA properly employed Exemption 7(D) where it demonstrated an implied assurance of confidentiality).

Here, the FBI has properly withheld certain information that was compiled for law enforcement purposes and that could reasonably be expected to disclose the identity of a confidential source of information. See Hardy Decl., ¶¶ 78-89 and fns. 32-38. "Persons involved in FBI investigations – even if they are not the subject of the investigation – 'have a substantial interest in seeing that their participation remains secret.'" See Quinon v. FBI, 86 F.3d 1222, 1230 (D.C. Cir. 1996) (quoting Fitzgibbon v. CIA, 911 F.2d 755, 767 (D.C. Cir. 1990)). The mere "mention of an individual's name in a law enforcement file" is generally sufficient to justify nondisclosure because it "will engender comment and speculation and carr[y] a stigmatizing connotation." Fitzgibbon, 911 F.2d at 767, quoting Branch v. FBI, 658 F. Supp. 204, 209 (D.D.C. 1987).[15] Thus, Exemption

[15] The FBI recognizes that in United States Department of Justice v. Landano, 508 U.S. 165,181 (1993), the Supreme Court held that the

7(D) was also properly applied. See ¶¶ Hardy Decl., ¶¶ 78-89 and fns. 32-37; Petrucelli, 51 F. Supp. 3d at 171 (citing Miller v. United States Dep’t of Justice, 562 F.Supp.2d 82, 123 (D.D.C. 2008) (protecting interviewees who provided detailed information about activities of the requester and his associates, particularly given requester's history of kidnapping, murder and dismemberment of bodies) and Truesdale v. DOJ, Civil Action No. 03–1332, 2005 WL 3294004, at *7 (D.D.C. Dec. 5, 2005) (protecting witnesses to drug trafficking activities of a requester who had been “convicted of engaging in a continuing criminal enterprise, a conspiracy to distribute cocaine, and firearms offenses”)).

---

Government is not entitled to a presumption that a source is confidential within the meaning of Exemption 7(D) whenever the source provides information to the FBI in the course of a criminal investigation. the FBI has, however, explained why the sources regarding whom it has asserted Exemption 7(D) were either granted an express assurance of confidentiality or that the circumstances under which they provided the information were such that such an assurance was implied. See Hardy Decl., ¶¶ 79-80, 83-89.

4. The FBI Has Properly Withheld Certain Requested Records Under 5 U.S.C. § 552(b)(7)(E).

Exemption 7(E) of the FOIA provides protection for all information compiled for law enforcement purposes when release "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions, if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). See also American Immigration Lawyers Ass'n v. U.S. Dep't of Homeland Security, 852 F.Supp.2d 66 (D.D.C. 2012). The first clause of Exemption 7(E) affords "categorical" protection for "techniques and procedures" used in law enforcement investigations or prosecutions. Smith v. Bureau of Alcohol, Tobacco and Firearms, 977 F.Supp. 496, 501 (D.D.C. 1997)(citing Fisher v. United States Dep't of Justice, 772 F. Supp. 7, 12 n.9 (D.D.C. 1991), aff'd, 968 F.2d 92 (D.C. Cir. 1992)). While Exemption 7(E)'s protection is generally limited to techniques or procedures that are not well known to the public, even commonly known procedures may be protected from disclosure if the disclosure could reduce or nullify their effectiveness. See, e.g., Coleman v. FBI, 13 F.Supp. 2d. 75, 83 (D.D.C. 1998) (applying Exemption 7(E) to behavioral science analysis and details of polygraph examination); Butler v. Treasury, 1997 WL 138720 at *4 (D.D.C. 1997) (applying Exemption 7(E) to types

of monitoring and type of equipment used in surveillance); Perrone v. FBI, 908 F.Supp. 24, 28 (D.D.C. 1995) (applying Exemption 7(E) to type of polygraph test, type of machine used, polygraph questions and sequence).

In justifying the application of Exemption 7(E) the agency may describe the general nature of the technique while withholding the full details. See e.g. Bowen v. FDA, 925 F.2d 1225, 1228 (9th Cir. 1991). The agency is not, however, required to describe secret law enforcement techniques, even in general terms, if the description would disclose the very information sought to be withheld. Coleman, 13 F.Supp. 2d at 83; Smith, 977 F.Supp. at 501; Butler, 1997 WL 138720 at *4.

Here, where the FBI has withheld information responsive to Plaintiff's FOIA request based on application of 5 U.S.C. § 552(b)(7)(E), the information withheld is properly summarized as within the follows categories, which constitute information the release of which would disclose one or more techniques or procedures for law enforcement investigations or prosecutions and could reasonably be expected to risk circumvention of the law:

sensitive security details concerning special events, such as Mandela's visits to the U.S.

information in an draft Operations Plan created in preparation for U.S. Dignitaries visiting South Africa for Nelson Mandela's funeral

the investigative focus of specific FBI investigations

secure fax number, internal e-mail addresses and/or non-public intranet web address

methods the FBI uses to collect and analyze the information it obtains for investigative purposes

protected key indicators used for determinations of entry of data into non-public databases used for official law enforcement purposes by the FBI and/or law enforcement personnel

database printouts obtained from the National Crime Information Center (NCIC)

protected information on Mandela-384 concerning the capabilities, types, and location of surveillance techniques utilized in efforts to provide protective services to Nelson Mandela during a visit to the U.S. and in an effort to proactively thwart any potential terrorist or criminal acts against Mandela

sensitive case file numbers, including sub-file titles

information pertaining to the types and dates of investigations referenced in the records at issue in this case

information pertaining to the FBI Informant Program

a security technique used by the Department of State in providing security to foreign dignitaries

Hardy Decl., ¶¶ 91-100 and fn.39 and Exhibit C (Stein Decl.), ¶¶ 10, 12-14, 24.

The FBI Has Provided All Reasonably Segregable Material.

The Court of Appeals has held that a District Court has an obligation, even in the absence of a specific challenge by a FOIA plaintiff on the issue, to make an independent inquiry into whether all reasonably segregable non-exempt information has been provided

to the Plaintiff. See Trans-Pacific Policing Agreement v. Customs Service, 177 F.3d 1022, 1028 (D.C. Cir. 1999). In this case, the detailed declaration submitted by the FBI, particularly when viewed against the physical redactions on the underlying documents makes clear that all reasonably segregable material has been provided. See Hardy Decl., ¶¶ 1-4, 50, 103, 106-07; Shiner Decl., ¶¶ 38-39, Williams Decl., ¶ 23; Def. SMF, ¶ 110.

## CONCLUSION

WHEREFORE, the above civil action should be dismissed as to the claims against the Department of Justice, or summary judgment entered in its favor.

Respectfully submitted,

CHANNING D. PHILLIPS, DC Bar #415793
United States Attorney

DANIEL F. VAN HORN, DC Bar #924092
Chief, Civil Division

By: ______________________________ /s/
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RYAN NOAH SHAPIRO<br><br>Plaintiff,<br><br>v.<br><br>CENTRAL INTELLIGENCE AGENCY, et al.,<br><br>Defendants. | Civil Action No. 14-19 CRC |

FBI'S STATEMENT OF MATERIAL FACTS AS
TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Local Civil Rule 7(h), the Federal Bureau of Investigation ("FBI") hereby provide the following statement of material facts as to which there is no genuine dispute:

**THE SEARCHES/PROCESSING**

1. By letter dated December 11, 2013, plaintiff submitted his request to the FBI seeking, "disclosure of any and all records that were prepared, received, transmitted, collected and/or maintained by the FBI, the Terrorist Screening Center, the National Joint Terrorism Task Force, or any Joint Terrorism Task Force relating or referring to the deceased individual Rolihlahla Mandela, (aka Nelson Mandela, aka Madiba, aka Tata)." See Hardy Decl.; ¶ 5; ECF No. 9-1, Exh. 2.

2. In response to Plaintiff's request, and over the course of 18 rolling releases, the FBI processed a total of 1,519

responsive pages located in 11 main files and 177 cross-references. Of these pages, 1,244 pages were released in full or part, and 272 pages were withheld in full. Nelson Mandela's involvement in world affairs and his legacy place him in the midst of a wide array of voluminous records. The FBI located records that did not substantively pertain to Nelson Mandela, but were mere mentions of his name (i.e.., references to books on Mandela, buildings named after Nelson Mandela, references to Winnie Mandela in which Nelson Mandela is merely mentioned as her husband, references as a source of inspiration in various movements, etc.). These types of non-substantive references were not processed. The FBI only processed main files and references discussing substantive actions by, or relating to, the life and work of Nelson Mandela.

3. The below chart summarizes the reviews and rolling releases provided by the FBI between May 2014 and present. In addition, with its December 19, 2014 release the FBI advised plaintiff that expedited processing was granted based on 28 C.F.R. §16.5 (d)(1)(iii): "An urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information."

4. With its May 28, 2014 release, the FBI addressed Plaintiff's request for a waiver of fees, stating, "Your request

for a fee waiver is granted as the FBI determined that this material will be placed on the public FBI Vault."

5. In addition, the FBI advised plaintiff that information was referred to other government agencies. The FBI reminded plaintiff in each release that, although his request is in litigation, he could appeal the FBI's determination by filing an administrative appeal with the Department of Justice ("DOJ"), Office of Information Policy ("OIP") within sixty days. (See Hardy Decl., Exhibit B, "Release Letters".)

6. Main files pertain to records indexed to the main subject(s) of a file, known as "main file" records. Hardy Decl., ¶ 9 fn.2.

7. The "main" entry carries the name of an individual, organization, or other subject matter that is the designated subject of the file. Id.

8. Cross-references pertains to records that merely mention or reference an individual, organization, or other subject matter that is contained in a "main" file record about a different subject matter. Id.

**The FBI's Central Records System**

9. The FBI's Central Records System ("CRS") is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled

and maintained by the FBI in the course of fulfilling its integrated missions and functions as a law enforcement, counterterrorism, and intelligence agency to include performance of administrative and personnel functions. Hardy Decl., ¶ 19.

10. The CRS spans the entire FBI organization and encompasses the records of FBI Headquarters ("FBIHQ"), FBI Field Offices, and FBI Legal Attaché Offices ("Legats") worldwide. Hardy Decl., ¶ 19.

11. The CRS consists of a numerical sequence of files, called FBI "classifications," which are organized according to designated subject categories. Hardy Decl., ¶ 20.

12. The broad array of CRS file classification categories include types of criminal conduct and investigations conducted by the FBI, as well as categorical subjects pertaining to counterterrorism, intelligence, counterintelligence, personnel, and administrative matters. Hardy Decl., ¶ 20.

13. For identification and retrieval purposes across the FBI, when a case file is opened, it is assigned a Universal Case File Number ("UCFN") consisting of three sequential components: (a) the CRS file classification number, (b) the abbreviation of the FBI Office of Origin ("OO") initiating the file, and (c) the assigned individual case file number for that particular subject matter. Hardy Decl., ¶ 20.

14. For example, in a fictitious file number of 11Z-HQ-56789;"

the "11Z" component indicates the file classification, "HQ". Hardy Decl., ¶ 20 and fn. 7.

15. Within each case file, pertinent documents of interest are "serialized," or assigned a document number in the order which the document is added to the file, typically in chronological order. Hardy Decl., ¶ 20.

**The FBI's CRS General Indices And Indexing**

16. The FBI's general indices to the CRS are the index or "key" to locating records within the enormous amount of information contained in the CRS. Hardy Decl., ¶ 21.

17. The FBI's CRS is indexed in a manner which meets the FBI's investigative needs and priorities, and allows FBI personnel to reasonably and adequately locate pertinent files in the performance of their law enforcement duties. Hardy Decl., ¶ 21.

18. The FBI's general indices are arranged in alphabetical order and comprise an index on a variety of subject matters to include individuals, organizations, events, or other subjects of investigative interest that are indexed for future retrieval. Hardy Decl., ¶ 21.

19. The entries in the general indices fall into two category types, "main entry" and "reference entry." Hardy Decl., ¶ 21.

20. At the FBI, a main entry pertains to records indexed to

the main subject(s) of a file, known as "main file" records; and the "main" entry carries the name of an individual, organization, or other subject matter that is the designated subject of the file. Hardy Decl., ¶ 21.

21. At the FBI, a reference entry, also called a "cross-reference," pertains to records that merely mention or reference an individual, organization, or other subject matter that is contained in a "main" file record about a different subject matter. Hardy Decl., ¶ 21.

22. FBI employees may index information in the CRS by individual (persons), by organization (organizational entities, places, and things), and by event (*e.g.,* a terrorist attack or bank robbery); and indexing information in the CRS is based on operational necessity. Hardy Decl., ¶ 22.

23. The FBI only indexes that information considered relevant and necessary for future retrieval; thus, the FBI does not index every individual name or other subject matter in the general indices. Hardy Decl., ¶ 22.

**The FBI's Automated Case Support**

24. Automated Case Support ("ACS") is an electronic, integrated case management system that became effective for FBIHQ

and all FBI Field Offices and Legats on October 1, 1995. Hardy Decl., ¶ 23.

25. As part of the ACS implementation process, over 105 million CRS records were converted from automated systems previously utilized by the FBI into a single, consolidated case management system accessible by all FBI offices. Hardy Decl., ¶ 23.

26. ACS has an operational purpose and design to enable the FBI to locate, retrieve, and maintain information in its files in the performance of its myriad missions and functions; ACS and the next generation Sentinel system are relied upon by the FBI daily to fulfill essential functions such as conducting criminal, counterterrorism, and national security investigations, background investigations, citizenship and employment queries, and security screening, to include Presidential protection. Hardy Decl., ¶ 23 and fn.8.

27. The Universal Index ("UNI") is the automated index of the CRS and provides all offices of the FBI a centralized, electronic means of indexing pertinent investigative information to FBI files for future retrieval via index searching. Hardy Decl., ¶ 24.

28. Individual names may be recorded with applicable identifying information such as date of birth, race, sex, locality,

Social Security Number, address, and/or date of an event; moreover, ACS implementation built upon and incorporated prior automated FBI indices; therefore, a search employing the UNI application of ACS encompasses data that was already indexed into the prior automated systems superseded by ACS. Hardy Decl., ¶ 24.

29. A UNI index search in ACS is capable of locating FBI records created before its 1995 FBI-wide implementation to the present day in both paper and electronic format. Hardy Decl., ¶ 24.

30. Older CRS records that were not indexed into UNI as a result of the 1995 ACS consolidation remain searchable by manual review of index cards, known as the “manual indices.” Hardy Decl., ¶ 24 and fn.9.

31. A search of the manual indices is triggered for requests on individuals if the person was born on or before January 1, 1958; and for requests seeking information about organizations or events on or before January 1, 1973. Hardy Decl., ¶ 24 and fn.9.

32. Records created after these dates would be captured through a UNI search; thus, a manual search is not applicable to Plaintiff’s request because the subject, Nelson Mandella, was born on July 18, 1918 and died on December 5, 2013. Hardy Decl., ¶ 24 and fn.9.

33. Currently, UNI consists of approximately 113.4 million searchable records and is updated daily with newly indexed material. Hardy Decl., ¶ 24.

**The FBI's ACS and Sentinel**

34. Sentinel is the FBI's next generation case management system that became effective FBI-wide on July 1, 2012. Sentinel provides a web-based interface to FBI users, and it includes the same automated applications that are utilized in ACS. Hardy Decl., ¶ 25.

35. After July 1, 2012, all FBI generated records are created electronically in case files via Sentinel; however, Sentinel did not replace ACS and its relevance as an important FBI search mechanism. Hardy Decl., ¶ 25.

36. Just as pertinent information was indexed into UNI for records generated in ACS before July 1, 2012, when a record is generated in Sentinel, information is indexed for future retrieval; moreover, there is an index data sharing nexus between the Sentinel and ACS systems whereby components of information indexed into Sentinel are also replicated or "backfilled" into ACS. Hardy Decl., ¶ 25.

37. The Sentinel case management system builds on ACS and shares its operational purpose; Sentinel provides another portal to

locate information within the vast CRS for FBI records generated on or after July 1, 2012. Hardy Decl., ¶ 25.

38. Nelson Mandela died on December 5, 2013; therefore, both ACS and Sentinel were searched by the FBI, along with the manual indices records. Hardy Decl., ¶ 25 and fn.10.

**The FBI's Electronic Surveillance Indices ("ELSUR")**

39. The Electronic Surveillance ("ELSUR") indices comprise records related to electronic surveillance sought, administered, and/or conducted by the FBI since January 1, 1960. Hardy Decl., ¶ 26; Privacy Act Systems of Records Notice JUSTICE/FBI-006; 72 F.R. 3410 (last publication of complete notice).

40. The ELSUR indices include records of (a) targeted individuals and entities of electronic surveillance pursuant to court order, consensual monitoring, or other authority; (b) owners, lessors, or licensors of the premises where the FBI conducted electronic surveillance; (c) and individuals identified as participants of monitored/recorded conversations. Hardy Decl., ¶ 26.

41. Since January 1, 1960, FBI Field Offices included in their ELSUR indices -- and reported to FBIHQ for inclusion in its ELSUR index -- the names of all persons whose voices have been

monitored through a FBI microphone installation or a telephone surveillance. Hardy Decl., ¶ 27.

42. On or about October 9, 1991, the ELSUR indices were automated FBI-wide, and since that time, FBIHQ and all FBI field offices have electronically generated, maintained, modified, and accessed all ELSUR records. Hardy Decl., ¶ 27.

43. Similar to the consolidation of all indexed record data from prior automated CRS systems superseded by ACS, the prior automated ELSUR indices also interfaced with ACS upon its implementation in 1995. Hardy Decl., ¶ 28.

44. As a result, the names of monitored subjects by FBIHQ or FBI Field Offices since January 1, 1960 are indexed within, and searchable by, the same UNI application employed to locate CRS records. Hardy Decl., ¶ 28.

45. For clarity, while ELSUR has a distinct legal identity from the CRS as a different Privacy Act System of Records, in terms of function, information from both ELSUR and the CRS are indexed and retrieved via index searches of the FBI’s two case management systems: ACS and Sentinel. Hardy Decl., ¶ 28.

46. Main and Cross-Reference Files. At the time FBI received Plaintiff’s FOIA request, RIDS policy was to search for and identify

only "main" files responsive to most FOIPA requests at the administrative stage; therefore, RIDS conducted an additional search of the CRS to locate any "cross reference" material responsive to Plaintiff's request. Hardy Decl., ¶ 29.

47. Index Searching. To locate CRS information at the FBI, RIDS employs an index search methodology. Index searches of the CRS are reasonably expected to locate responsive material within the vast CRS since the FBI indexes pertinent information into the CRS to facilitate retrieval based on operational necessity; given the broad range of indexed material in terms of both time frame and subject matter that it can locate in FBI files, the automated UNI application of ACS is the mechanism RIDS employs to conduct CRS index searches. Hardy Decl., ¶ 30.

48. If a request seeks records that may have been generated on or after July 1, 2012, an overlapping search of ACS via the UNI application and a Sentinel index search are performed at the litigation stage to ensure adequacy of the CRS index search. Hardy Decl., ¶ 30.

49. CRS Search and Results. In response to plaintiff's request, RIDS conducted a CRS index search for responsive records employing the UNI application of ACS and a Sentinel index search by conducting a Two Way Phonetic search of the name Nelson Mandela. In

addition, RIDS conducted an "on the nose" search of other aliases provided by the plaintiff. They include, "Rolihlahla Mandela," "Madiba," and "Tata." A two-way phonetic search uses the phonetic search capabilities of ACS to conduct a search of Mandela's name. This means first, the computer automatically broke his name down and searched the index for two different breakdowns of the name entered. Then, the computer breaks names down based on their phonetic characteristics. The computer will return results based on whether or not they phonetically match a certain percentage of the first and last name searched. Furthermore, the FBI also conducted a search of its manual indices.

50. In addition to the CRS Index search, the FBI conducts a Manual Indices search of field office records when a request is made for individuals born prior to June 30, 1973 and a Manual Indices search of FBIHQ files when the request is for records concerning an individual born before January 1, 1958. A search of Legat Manual Indices is conducted for individuals born prior to October 16, 1980. Hardy Decl., ¶ 31, fn.13.

51. This insures that any records created prior to the implementation of ACS are also captured in the FBI's search efforts. Hardy Decl., ¶ 31, fn.13.

52. Since Nelson Mandela was born on July 18, 1918, the FBI conducted a search of the Manual Indices for field offices, FBIHQ, and legats in addition to the CRS search using ACS and Sentinel. Hardy Decl., ¶ 31, fn.13.

53. The FBI also reached out to the ELSUR unit at the FBI to conduct another search (in addition to the CRS search that would also have turned up any additional leads) of the terms described in paragraph ¶31 of the Hardy Declaration. Hardy Decl., ¶ 31, fn.13.

54. No additional records were located through the separate ELSUR search; however records were located during the manual indices search, the ACS search and Sentinel search. Hardy Decl., ¶ 31, fn.13.

55. This search provided a lead to another alias, "Black Pimpernel." Hardy Decl., ¶ 31.

56. The FBI also conducted an "on the nose" search of this alias. Hardy Decl., ¶ 31.

57. This search also uses the phonetic search capabilities of ACS to conduct the search of each AKA or alias entered, meaning the computer will search exactly the name entered in the name field and only that name. Hardy Decl., ¶ 31.

58. For Sentinel, Manual Indices, and ELSUR searches, each breakdown was entered manually into the system. Hardy Decl., ¶ 31.

59. As a result of these search efforts, the FBI located 11 responsive main files and 177 responsive cross reference records. Hardy Decl., ¶ 31.

60. Initially, the FBI search results returned a much larger universe of records. Upon further review many of these references were found to be mere mentions and not responsive to the plaintiff's request in that they did not substantively refer to Nelson Mandela. Hardy Decl., ¶ 31, fn.14.

61. These non-responsive records located during the search also included other individuals with different middle names or had similar names, related to organizations, and/or events which merely mentioned Nelson Mandela. Hardy Decl., ¶ 31, fn.14.

62. Each and every search result was carefully reviewed, along with the context in which it appeared, to make the responsiveness determination. Hardy Decl., ¶ 31, fn.14.

63. For older records in the CRS that did not contain enough text in the system to make a determination of responsiveness, those records were ordered and manually reviewed prior to making a determination on responsiveness. Hardy Decl., ¶ 31, fn.14.

64. ELSUR Search and Results. In this case, the UNI application of ACS and the Sentinel index search also accomplished the task of searching the ELSUR indices for any responsive records.

Hardy Decl., ¶ 32.

65. As noted above, although ELSUR has a different identity from the CRS as a Privacy Act System of Records, the functional task of indexing and retrieving information from both ELSUR and the CRS is accomplished via indexing pertinent information for retrieval in the FBI’s ACS and Sentinel case management systems. See Hardy Decl., ¶¶ 26-28, 32.

66. Accordingly, the same search terms described in the Declaration of David M. Hardy to perform the index search for the FBI’s CRS indexed records were also utilized to locate any ELSUR records. See Hardy Decl., ¶¶ 31-32.

67. Thus, the FBI’s RIDS conducted a search reasonably calculated to locate records responsive to Plaintiff’s request. See Hardy Decl., ¶¶ 29-34.

68. Scope of Search. RIDS conducted a search reasonably calculated to locate records responsive to plaintiff’s request. Hardy Decl., ¶ 33.

69. First, given its comprehensive nature and scope, the CRS is the principal records system searched by RIDS, to locate information responsive to most FOIPA requests, as the CRS is where the FBI indexes information about individuals, organizations, and

other subjects of investigative interest for future retrieval. See Hardy Decl., ¶¶ 21-22, 33.

70. Second, the CRS is the FBI system where records responsive to this request would reasonably be found; and given plaintiff's request seeking information about Nelson Mandela and the FBI's mission and functions, such information would reasonably be expected to be located in the CRS via the index search methodology. Hardy Decl., ¶ 33.

71. Third, in this case, the ELSUR indices were likewise searched via the UNI application of ACS, and an index search of Sentinel also accomplished the task of locating any responsive records in ELSUR via the same index search terms. Hardy Decl., ¶ 33.

72. Further, ELSUR records were also searched by ELSUR personnel with no differing result. Hardy Decl., ¶ 33.

73. Searches of Other Systems or Locations. Plaintiff also requested that the FBI search other particular systems or locations for responsive records. Hardy Decl., ¶ 34.

74. Specifically, plaintiff seeks searches of multiple other locations and systems, however, plaintiff failed to provide any basis as to why the information would be outside the CRS. Hardy Decl., ¶ 34.

75. Given the nature of plaintiff's request seeking information concerning Nelson Mandela and the comprehensive nature of the information contained in the CRS (See supra ¶¶ 19-20), the CRS is the FBI system of records where responsive records would reasonably be found. Hardy Decl., ¶ 34.

76. Moreover, the ELSUR system was also searched when the UNI application of ACS and an index search of Sentinel were used to locate any responsive CRS records via the same index search terms. Hardy Decl., ¶ 34.

77. As applicable here, plaintiff provided no information for RIDS to reasonably conclude that records would reside outside the CRS or ELSUR. Hardy Decl., ¶ 34.

78. Moreover, there is no indication from the information located as the result of the CRS and ELSUR index search efforts that responsive material would reside in any other FBI system or location. Hardy Decl., ¶ 34.

79. Therefore, there is no basis for RIDS to conclude a search elsewhere could reasonably be expected to locate responsive material, and such a search would thus be unduly burdensome in nature. Hardy Decl., ¶ 34.

**THE EXEMPTIONS**

80. The FBI has have accurately described the bases for concluding that the non-disclosure of information to Plaintiff was appropriate under the Freedom of Information Act. See, e.g., Hardy Decl., ¶¶ 4-18, 35-104; see also Hardy Decl., Exhibit C (Declaration of Eric F. Stein, ¶¶ 6-23), Exhibit D (Declaration of Antoinette B. Stein, ¶¶ 6-39, Exhibit E (Declaration of Alesia Williams, ¶¶ 4-23).

81. The FBI has accurately summarized the Freedom of Information Act exemptions and the information withheld under those exemptions it has employed in paragraph 38 of the Declaration of David M. Hardy. Hardy Decl., ¶ 38; see also id., ¶¶ 35-105 and Exhibits.

**Exemption (b)(1)**

82. In each instance when the FBI has employed the Freedom of Information Act exemption found in 5 U.S.C. § 552(b)(1), it has done so to protect from disclosure information under the control of the United States Government that is: 1) authorized by Executive Order 13526 to be classified and designated to be kept secret in the interest of national defense or foreign policy, and 2) actually and properly classified under that executive order. Hardy Decl., ¶¶ 39-52 and Exhibit C (Stein Decl.), ¶ 23; Exhibit D (Shiner Decl., ¶¶ 12-23), Exhibit (Williams Decl.), ¶¶ 8-18; *In Camera Ex Parte* Submission.

83. When the FBI has employed the Freedom of Information Act exemption found in 5 U.S.C. § 552(b)(1), all procedural requirements of E.O. 13526 were followed. Hardy Decl., ¶¶ 39-52 and Exhibit C (Stein Decl.), ¶ 23; Exhibit D (Shiner Decl., ¶¶ 12-23), Exhibit (Williams Decl.), ¶¶ 8-18; *In Camera Ex Parte* Submission.

84. When the FBI has employed the Freedom of Information Act exemption found in 5 U.S.C. § 552(b)(1), each document was marked as required and stamped with the proper classification designation. Hardy Decl., ¶¶ 39-52 and Exhibit C (Stein Decl.), ¶ 23; Exhibit D (Shiner Decl., ¶¶ 12-23), Exhibit (Williams Decl.), ¶¶ 8-18; *In Camera Ex Parte* Submission.

85. When the FBI has employed the Freedom of Information Act exemption found in 5 U.S.C. § 552(b)(1), each document was marked to indicate clearly which portions are classified, and which portions are exempt from declassification as set forth in E.O. 13526 § 1.5(b). Hardy Decl., ¶¶ 39-52 and Exhibit C (Stein Decl.), ¶ 23; Exhibit D (Shiner Decl., ¶¶ 12-23), Exhibit (Williams Decl.), ¶¶ 8-18; *In Camera Ex Parte* Submission.

86. When the FBI has employed the Freedom of Information Act exemption found in 5 U.S.C. § 552(b)(1), the prohibitions and limitations on classification specified in E.O. 13526 § 1.7 were adhered to. Hardy Decl., ¶¶ 39-52 and Exhibit C (Stein Decl.), ¶ 23;

Exhibit D (Shiner Decl., ¶¶ 12-23), Exhibit (Williams Decl.), ¶¶ 8-18; *In Camera Ex Parte* Submission.

87. When the FBI has employed the Freedom of Information Act exemption found in 5 U.S.C. § 552(b)(1), the declassification policies set forth in E.O. 13526 §§ 3.1 and 3.3 were followed. Hardy Decl., ¶¶ 39-52 and Exhibit C (Stein Decl.), ¶ 23; Exhibit D (Shiner Decl., ¶¶ 12-23), Exhibit (Williams Decl.), ¶¶ 8-18; *In Camera Ex Parte* Submission.

88. When the FBI has employed the Freedom of Information Act exemption found in 5 U.S.C. § 552(b)(1), any reasonably segregable portions of the classified documents that did not meet the standards for classification under E.O. 13526 were declassified and marked for release, unless withholding was otherwise warranted under applicable law. Hardy Decl., ¶¶ 39-52 and Exhibit C (Stein Decl.), ¶ 23; Exhibit D (Shiner Decl., ¶¶ 38-39), Exhibit (Williams Decl.), ¶ 23; *In Camera Ex Parte* Submission.

89. Where the FBI asserted Exemption 1 to withhold information, the document was personally and independently examined, and the examiner determined that this classified information is owned by, was produced by or for, and /or is under the control of the U.S. Government, that the classified information continues to warrant classification at the SECRET level pursuant to E.O. 13526 § 1.4(b), foreign government information; 1.4(c), intelligence activities

(including covert action), intelligence sources or methods, or cryptology; and 1.4(d), foreign relations. See Hardy Decl., ¶¶ 43-44, 107 and Exhibit C (Stein Decl.), ¶ 23, Exhibit D (Shiner Decl., ¶¶ 14-20, Exhibit E (Williams Decl.), ¶¶ 10-13.

90. Insofar as it can be made public, more specific factual information surrounding the withholdings under the Freedom of Information Act exemption found in 5 U.S.C. § 552(b)(1) can be found in paragraphs 4, 39-52 of the Declaration of David M. Hardy and in Exhibits C, D and E, thereto. Hardy Decl., ¶¶ 4, 39-52 and Exhibit C (Stein Decl.), ¶ 23, Exhibit D (Shiner Decl., ¶¶ 12-33, Exhibit E (Williams Decl.), ¶¶ 8-18; see also, *In Camera Ex Parte* Submission.

**Exemption (b)(3)**

91. In each instance when the FBI has employed the Freedom of Information Act exemption found in 5 U.S.C. § 552(b)(3), it has done so properly to withhold information pursuant to statutes leaving them no discretion, where particular criteria for withholding have been established that apply, or where the statute refers to particular types of matters to be withheld such as here; these statutes include: 1) Section 102A(i)(1) of the National Security Act of 1947 ("NSA"), as amended by the Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), 50 U.S.C. § 3024(i)(1); 2) 10 U.S.C. § 424; and/or

3) 50 U.S.C. § 3507. See, e.g., Hardy Decl., ¶¶ 53-57 and Exhibit D (Shiner Decl.), ¶¶ 34-37 & Exhibit E (Williams Decl.), ¶¶ 19-21.

92. In order to fulfill its obligation of protecting intelligence sources and methods, the Director of National Intelligence ("DNI") is authorized to establish and implement guidelines for the Intelligence Community ("IC") for the classification of information under applicable laws, Executive Orders, or other Presidential Directives, and for access to and dissemination of intelligence. 50 U.S.C. § 3024(i)(1); Hardy Decl., ¶ 55.

93. In implementing this authority under 50 U.S.C. § 3024(i)(1), the DNI promulgated Intelligence Community Directive 700, which provides that Intelligence Community elements shall protect "national intelligence and intelligence sources and methods and activities from unauthorized disclosure." Id.; Hardy Decl., ¶ 55.

94. The FBI is one of 17 member agencies comprising the Intelligence Community, and as such must protect intelligence sources and methods. Id.; Hardy Decl., ¶ 55.

95. Given the plain Congressional mandate to protect the Intelligence Community's sources and methods of gathering intelligence, the FBI has determined that intelligence sources and methods would be revealed if any of the withheld information is

disclosed to plaintiffs; therefore, the FBI is prohibited from disclosing such information under 50 U.S.C. § 3024(i)(1). Hardy Decl., ¶ 56 and Exhibit D (Shiner Decl.), ¶¶ 36-37 & Exhibit E (Williams Decl.), ¶ 21.

96. Indeed, in each instance when the Defendants have employed the Freedom of Information Act exemption found in 5 U.S.C. § 552(b)(3), it has done so as required by the applicable withholding statutes to withhold intelligence sources and methods and similar information. Hardy Decl., ¶¶ 53-57 and Exhibit D (Shiner Decl.), ¶¶ 35-37 & Exhibit E (Williams Decl.), ¶¶ 19-21; Intelligence Community Directive 700, https://www.dni.gov/files/documents/ICD/ICD_700.pdf.

**Exemption (b)(5)**

97. In the one instance when the FBI has employed the Freedom of Information Act exemption found in 5 U.S.C. § 552(b)(5), the FBI has employed Exemption 5 and the deliberative process privilege for withholding a ten-page draft Operations Plan (pages marked Mandela 832-841). Hardy Decl., ¶ 61 and fn.23.

98. This draft Operations Plan meets the threshold requirement because it is an intra-agency document and pre-dates the final decision. Hardy Decl., ¶ 61.

99. This plan concerns preparations by FBI Pretoria Legat to support a U.S. Delegation to the South African state funeral for former South African President Nelson Mandela (See Mandela-829 for further description) and is not the final plan, Hardy Decl., ¶ 61,; and it is labeled on its cover as a “draft,” predates the death of Nelson Mandela, and makes numerous references to additional information that is sought or will need to be included upon receipt of additional funeral arrangement details. Hardy Decl., ¶ 61.

**Exemption (b)(6) and 7(C)**

100. Here, the FBI applied Exemption B(6)in conjunction with Exemption 7(C) to withhold information from law enforcement files, including: 1) names and identifying information of FBI Special Agents ("SAs") and support personnel who were responsible for conducting, supervising, and/or maintaining the investigative activities; 2) the names and/or identifying information of personnel from non-FBI federal government agencies who provided information to or otherwise assisted the FBI in these investigations; 3) the names and identifying information of local law enforcement employees who were acting in their official capacities and aided the FBI in the law enforcement investigative activities; 4) the names and identifying information[16] of third parties who were merely mentioned in the criminal investigative files; 5) the names and/or identifying information of third parties who were of investigative interest to the FBI; and 6) the names and identifying information of individuals who were interviewed and/or provided information to the FBI during the course of investigations Hardy Decl., ¶¶ 65-75.

[16] As used in the Hardy Declaration, the term "identifying information" may include, but is not limited to, dates of birth, social security numbers, addresses, employment and /or position, telephone numbers, and/or other personal information. Hardy Decl. ¶ 72 and fn.28.

101. In each instance where the FBI employed Exemption B(6) or B(7)(C), the FBI weighed the adverse effects of the release of the information to the individuals involved and the benefit to the public that disclosure could be expected to provide. Hardy Decl., ¶¶ 66-75 and fn.24; see also Id., Exhibit C (Stein Decl.), ¶¶ 6-9, 15-17, 19-24 & Exhibit E (Williams Decl.), ¶ 22.

102. In each instance where Exemption B6 and 7C were utilized, the benefits to production of the information did not suffice to overcome the privacy interests in those individuals whose identifying information was at issue. Hardy Decl., ¶¶ 65-75, 101-103 and Exhibit C (Stein Decl.), ¶¶ 6-9, 15-17, 19-24 & Exhibit E (Williams Decl.), ¶ 22

**Exemption (b)(7) Threshold**

103. Where the Defendants have withheld information responsive to Plaintiff's FOIA requests based on application of any subsection of 5 U.S.C. § 552(b)(7) (including those set forth above under Exemption 7(C)), the information withheld was compiled for one or more law enforcement purposes. Hardy Decl., ¶¶ 38, 62-64 and Exhibit C (Stein Decl.), ¶¶ 10, 12-13, 17-18, 21-22, 24.

**Exemption (b)(7)(A)**

104. In this case the FBI has asserted Exemption (b)(7)(A) in a limited fashion to protect the names, personal identifying information, file numbers, and activities of third-party subjects

of pending FBI investigations among the responsive documents. The release of the names, identifying information, file numbers, and activities of third parties of on-going FBI investigations could result not only in the acknowledgment of the existence of the investigations, but also expose the identity of suspects, thereby jeopardizing the investigations. Hardy Decl., ¶ 77.

105. The FBI has applied Exemption (b)(7)(A) to protect the names, personal identifying information, file numbers, and activities of third parties of these open investigations on three pages: Mandela 520-521, and Mandela 1160. Hardy Decl., ¶ 77

106. Mandela-520-521 concerns a fugitive from justice in an ongoing domestic terrorism case who has not yet been apprehended. Mandela-1160 concerns the subject of an ongoing domestic terrorism investigation. Hardy Decl., ¶ 77.

**Exemption (b)(7)(D)**

107. Here, the FBI has properly withheld certain information that was compiled for law enforcement purposes and that could reasonably be expected to disclose the identity of a confidential source of information who was provided an explicit assurance of confidentiality or whose circumstances make apparent that an assurance of confidentiality would be inferred. See Hardy Decl., ¶¶ 78-89 and fns. 32-38.

**Exemption (b)(7)(E)**

108. Where the FBI has withheld information responsive to Plaintiff's FOIA request based on application of 5 U.S.C. § 552(b)(7)(E), the information withheld is properly summarized as within the follows categories, which constitute information the release of which would disclose one or more techniques or procedures for law enforcement investigations or prosecutions and could reasonably be expected to risk circumvention of the law:

sensitive security details concerning special events, such as Mandela's visits to the U.S.

information in an draft Operations Plan created in preparation for U.S. Dignitaries visiting South Africa for Nelson Mandela's funeral

the investigative focus of specific FBI investigations

secure fax number, internal e-mail addresses and/or non-public intranet web address

methods the FBI uses to collect and analyze the information it obtains for investigative purposes

protected key indicators used for determinations of entry of data into non-public databases used for official law enforcement purposes by the FBI and/or law enforcement personnel

database printouts obtained from the National Crime Information Center (NCIC)

protected information on Mandela-384 concerning the capabilities, types, and location of surveillance techniques utilized in efforts to provide protective services to Nelson Mandela during a visit to the U.S. and in an effort to proactively thwart any potential terrorist or criminal acts against Mandela

sensitive case file numbers, including sub-file titles

information pertaining to the types and dates of investigations referenced in the records at issue in this case

information pertaining to the FBI Informant Program

a security technique used by the Department of State in providing security to foreign dignitaries

Hardy Decl., ¶¶ 91-100 and fn.39 and Exhibit C (Stein Decl.), ¶¶ 10, 12-14, 24.

**Segregability**

110. In this case, the detailed declarations submitted by the FBI, particularly when viewed against the physical redactions on the underlying documents makes clear that all reasonably segregable material has been provided. See Hardy Decl., ¶¶ 1-4, 50, 103, 106-07; Shiner Decl., ¶¶ 38-39, Williams Decl., ¶ 23.

Respectfully submitted,

CHANNING D. PHILLIPS, DC Bar #415793
United States Attorney

DANIEL F. VAN HORN, DC Bar #924092
Chief, Civil Division

By: /s/
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of the foregoing FBI'S Motion To Dismiss Or, In The Alternative, For Summary Judgment, supporting memorandum, statement of material facts and declarations (excluding those submitted *ex parte in camera*) has been made through the Court's electronic transmission facilities on the 8th day of August, 2016.

/s/

W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, DC 20530
(202) 252-2536