# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**RYAN NOAH SHAPIRO,**

Plaintiff,

v.

Case No. 1:14-CV-00019 (CRC)

**CENTRAL INTELLIGENCE AGENCY, et. al.,**

Defendants.

## MEMORANDUM OPINION

Doctoral student Ryan Shapiro wants to know if the United States government was complicit in Nelson Mandela's arrest and imprisonment by South Africa's apartheid-era regime. To that end, Shapiro filed Freedom of Information Act requests with the Central Intelligence Agency, the National Security Agency, the Department of Defense's Defense Intelligence Agency, and the Federal Bureau of Investigation seeking virtually every document in their sprawling files that mentions or references Mandela. After refusing to narrow his request in any meaningful way, Shapiro has filed suit challenging each agency's response. The Court has previously ruled on motions filed by the CIA and NSA, and they, along with the DIA, continue to review and release responsive records. Now before the Court is a motion to dismiss or, alternatively, for summary judgment filed by the FBI, and a cross-motion for summary judgment filed by Shapiro.

Shapiro raises a laundry list of objections to the FBI's search and non-disclosure of responsive material under a variety of FOIA exemptions. For the reasons explained below, the Court will uphold the large majority of the challenged withholdings, but will reserve judgment in part and deny judgment in part to each side with respect to several withholdings whose appropriateness remains in dispute.

I.      **Background**

Ryan Shapiro describes himself as a student of "the political functioning of national security and the policing of dissent." Pl.'s First Am. Compl. ("Compl.") ¶ 2.  A serial FOIA requester, Shapiro submitted FOIA requests to the CIA, NSA, DIA, and FBI in December 2013, soon after Nelson Mandela's death.  Id. at ¶ 21.  In the FBI request, he sought "disclosure of any and all records that were prepared, received, transmitted, collected and/or maintained by the FBI, the Terrorist Screening Center, the National Joint Terrorism Task Force, or any Joint Terrorism Task Force relating or referring to deceased individual Rolihlahla Mandela, (aka Nelson Mandela, aka Madiba, aka Tata)." Compl., Ex. 2 ("FOIA Request") at 1.  Of particular interest to Shapiro were the 27 years Mandela spent in prison at the hands of South Africa's apartheid government and the surrounding rumors that the CIA was somehow involved in the arrest that led to his incarceration. Id. at 2.  Shapiro requested that the FBI search "all electronic and paper/manual indices, filing systems, and locations," including "all of its directorates" and at least thirty enumerated "filing systems, indices, and locations" for responsive records.  Id. at 4–5.  The request also encompassed emails and publicly available records.  Id. at 2, 6.  The FBI granted Shapiro's request for expedited processing on December 19, 2013.  Compl. ¶ 35.

The FBI—including its headquarters, field offices, and attaché offices abroad—uses the aptly named Central Records System to house the records it compiles and maintains in the "course of fulfilling its integrated . . . functions as a law enforcement, counterterrorism, and intelligence agency[.]" Def.'s Mem. Supp. Mot. Summ. J. ("MSJ"), Decl. of David M. Hardy ("First Hardy Decl.") ¶ 19.  Many of the records relevant here are contained in the FBI's case files.  When a case file is opened, it is assigned a Universal Case File Number ("UCFN"), comprised of three components: the Central Record System's file classification number, an abbreviation for the office that created it, and the assigned individual case file number for that subject matter.  Id. at ¶ 20.  The

FBI also maintains a Universal Index that allows records to be quickly retrieved via index searching.  Id. at ¶ 24.  The FBI conducted index searches to comb through multiple case-management systems for responsive records.  Id. at ¶¶ 30–34.  Since May 2014, the FBI has processed 1,519 responsive pages and made 18 rolling releases to Shapiro.  Def.'s Statement of Material Facts ("SMF") ¶ 2.  These pages were located in 11 "main" files (i.e., files names with corresponding to the requested subject matter) and 177 "cross-references" (i.e., files concerning other, unrelated subjects but that contain records referencing the requested subject matter).  Id. at ¶¶ 6,8.  Of the pages processed, the FBI released 1,244, in full or in part, and withheld 272 pages in full.  Id.  The FBI relied on the following FOIA exemptions when redacting information or withholding pages from release:  1, classified information; 3, information protected by another statute; 5, privileged information; 6 and 7(C), personal privacy; 7(A), pending law enforcement proceedings; 7(D), confidential source information; 7(E), law enforcement investigative techniques and procedures; and 7(F), personal safety of individuals involved in law enforcement activities.[1]

See First Hardy Decl. ¶ 38.  The application of these exemptions will be discussed in greater detail below.  With production complete as of summer 2016, the FBI now moves to dismiss Shapiro's complaint, and alternatively, for summary judgment.  It maintains that its search was adequate and that it has sufficiently justified its withholdings under the relevant FOIA exemptions.  Shapiro also moves for summary judgment, challenging the FBI's withholdings and its responsiveness determinations.  Pl.'s Mem. Supp. Cross-Mot. Summ. J. ("Cross-MSJ") 1.

---

[1] During summary-judgment briefing, the FBI explained that its invocation of Exemption 7(F) was at the bequest of the Drug Enforcement Administration ("DEA").  After revisiting the issue, the DEA agreed to release a two-word redaction.  See Def.'s Reply MSJ ("Reply") 11; id., Third Decl. of David M. Hardy ("Third Hardy Decl.") ¶ 42 (citing Def.'s Reply, Ex. B).  The application of Exemption 7(F) is therefore moot and need not be discussed.  See Arizonians for Official English v. Arizona, 520 U.S. 43, 64–67 (1997).

## II.     Legal Standard

"FOIA cases typically and appropriately are decided on motions for summary judgment." Defenders of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009).  In deciding a motion for summary judgment, the Court assumes the truth of the non-movant's evidence and draws all reasonable inferences in the non-movant's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  "It is well settled in Freedom of Information Act cases as in any others that summary judgment may be granted only if the moving party proves that no substantial and material facts are in dispute and that he is entitled to judgment as a matter of law."  Lamb v. Millennium Challenge Corp., 2017 WL 74690, at *4 (D.D.C. Jan. 6, 2017) (internal quotation omitted); see also Fed. R. Civ. P. 56(a).

Congress created FOIA "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  ACLU v. DOJ, 655 F.3d 1, 5 (D.C. Cir. 2011) (quoting U.S. Dep't of the Air Force v. Rose, 425 U.S. 352, 361 (1976)).  Despite this broad mandate, FOIA contains a set of exceptions to the general obligation to provide government records to the public. See 5 U.S.C. § 552(b).  These exemptions are in place "to balance the public's interest in governmental transparency against the 'legitimate governmental and private interests [that] could be harmed by release of certain types of information.'"  United Techs. Corp. v. U.S. Dep't of Defense, 601 F.3d 557, 559 (D.C. Cir. 2010) (quoting Critical Mass Energy Project v. Nuclear Reg. Comm'n, 975 F.2d 871, 872 (D.C. Cir. 1992) (en banc)).  FOIA "mandates a strong presumption in favor of disclosure," and its "statutory exemptions, which are exclusive, are to be 'narrowly construed.'"  Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting Rose, 425 U.S. at 361).

The government therefore bears the burden to establish that the claimed FOIA exemptions apply to each document for which they are invoked.  ACLU v. U.S. Dep't of Defense, 628 F.3d

612, 619 (D.C. Cir. 2011).  It may satisfy this burden through declarations that describe the justifications for its withholdings in "specific detail, demonstrat[ing] that the information withheld logically falls within the claimed exemption[.]"  Id.  But agency affidavits will not warrant summary judgment if the plaintiff puts forth contrary evidence or demonstrates the agency's bad faith.  Id.

## III.  Discussion

The Court will address Shapiro's objections to the FBI's claimed exemptions in sequential order, and will then turn to his responsiveness challenge.

### A.  Exemptions 1 and 3 Generally

FOIA Exemption 1 protects classified information.  Records are protected if "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . [if they are] properly classified pursuant to such Executive order."  5 U.S.C. § 522(b)(1).  Exemption 3 protects records that are exempted from disclosure by statute if that statute:

> **(A)(i)** requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or
> **(ii)** establishes particular criteria for withholding or refers to particular types of matters to be withheld; and
> **(B)** if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

5 U.S.C. § 522(b)(3).  In evaluating an agency's reliance on Exemption 1, "substantial weight" is given to "an agency's affidavit concerning the details of the classified status of the disputed record."  Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981).  Thus, "little proof or explanation is required beyond a plausible assertion that information is properly classified[.]"  Shapiro v. DOJ, 2017 WL 908179, at *13 (D.D.C. Mar. 6, 2017) (quoting Morley v. CIA, 508 F.3d 1108, 1124 (D.C. Cir. 2007)).  Exemption 3, by contrast, "differs from other FOIA exemptions in

that its applicability depends less on the detailed factual contents of specific documents; [rather] the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within that statute's coverage." Goland v. CIA, 607 F.2d 339, 350 (D.C. Cir. 1978). Courts will thus require an agency to demonstrate the exemption's applicability by providing "the kind of detailed, scrupulous description of the withheld documents that enables [them] to perform a searching de novo review." Shapiro, 2017 WL 908179 at *14 (quoting Church of Scientology of Ca., Inc. v. Turner, 662 F.2d 784, 786 (D.C. Cir. 1980)).

The FBI applied both these exemptions, often in combination with one another, when withholding information in response to Shapiro's FOIA request. See First Hardy Decl. ¶ 38. Its use of Exemption 1 relies on Executive Order 13,526, which governs the classification and protection of information affecting national security—such as intelligence activities, sources and methods, cryptology, and foreign relations or foreign activities. Id. at ¶¶ 40, 46–52. Similarly, the FBI invoked Exemption 3 pursuant to the National Security Act of 1947, 50 U.S.C. § 3024(i)(1). Id. The NSA was enacted before 2009 and leaves no discretion to agencies regarding non-disclosure of "all sources of intelligence that provide, or are engaged to provide, information the Agency needs to perform its statutory duties with respect to foreign intelligence." CIA v. Sims, 471 U.S. 159, 169–70 (1985). Therefore, if the FBI were to establish that the information withheld here pertains to intelligence sources and methods covered by the NSA, Exemption 3 would be properly applied.

In support of both exemptions' applicability, the FBI offers a series of declarations from Record and Information Dissemination Section Chief David M. Hardy and *ex parte*, *in camera* submissions regarding the classification process, the classification status of the withheld material, and the content contained therein. With respect to Exemption 1's classification requirement, Hardy avows personal familiarity with the records at issue, and, in his role as an original classification authority, was responsible for determining "that the information withheld pursuant to Exemption

[1] is under the control of the United States Government, is classified and requires a classification marking at the 'Secret' level since the unauthorized disclosure of the information reasonably could be expected to cause serious damage to national security." First Hardy Decl. ¶ 42.  Additionally, he confirms that the "procedural requirements of E.O. 13526 [were] followed" in classifying the documents.  Id.  In his opposition to the FBI's motion, Shapiro questioned the classification of documents over 25 years old, prompting the FBI to "re-review[] the approximately 100 pages citing Exemption 1."  Def.'s Reply MSJ ("Reply"); Third Decl. of David M. Hardy ("Third Hardy Decl.") ¶ 6.  On the basis of this additional review, the agency determined that declassification was warranted for four pages, which it subsequently released, and that the remaining pages still qualified for "Secret"-level classification.  Id.  The Court is therefore satisfied with the FBI's "plausible assertion that information [was] properly classified[.]"  Shapiro, 2017 WL 908179 at *13.

Turning to Exemption 3, the FBI applied this exemption to redact information that would either "reveal classified intelligence sources and methods [also] protected by Exemption 1 . . . [or] unclassified intelligence sources and methods [that] were employed as law enforcement techniques, procedures or guidelines[.]"  First Hardy Decl. ¶ 57; see Sims, 471 U.S. at 176 (holding that the NSA covers unclassified information regarding intelligence sources and methods).  Reacting to the FBI's somewhat conclusory declarations regarding intelligence sources and methods, Shapiro questions whether the content of the information is actually protected by the NSA.  Having now carefully examined the FBI's submissions (both public and in camera), the Court is assured that the withheld information falls well within E.O. 13,526 and the National Security Act's scope of protection, and was, therefore, properly excluded from the released records.

## B. Exemption 5

Exemption 5 permits agencies to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency[.]" 5 U.S.C. § 552(b)(5).  This exemption encompasses the deliberative process privilege, which protects government materials that are both (1) pre-decisional and (2) deliberative.  See Tax Analysts v. IRS, 117 F.3d 607, 616 (D.C. Cir. 1997).  To be pre-decisional, an agency should show "what deliberative process is involved, and the role played by the documents at issue in the course of that process[.]"  Heggestad v. DOJ, 182 F. Supp. 2d 1, 7 (D.D.C. 2000).  Information is deliberative if "it makes recommendations or expresses opinions on legal or policy matters." Vaughn v. Rosen, 523 F.2d 1136, 1144 (D.C. Cir. 1975).  Congress intended for this exemption "to encourage frank discussion of policy matters, prevent premature disclosure of proposed policies, and avoid public confusion that may result from disclosure of rationales that were not ultimately grounds for agency action."  Petrucelli v. DOJ, 51 F. Supp. 3d 142, 161 (D.D.C. 2014).

The FBI relied on Exemption 5 to withhold an entire ten-page draft Operations Plan concerning preparations for sending a U.S. delegation to South Africa for former President Mandela's funeral.[2]  First Hardy Decl. ¶ 61.  The FBI argues that the plan is accurately labeled as a draft because it required further information surrounding the funeral arrangements before it could be finalized, and therefore, is pre-decisional.  See id.  In a later declaration, the FBI—for the first time—asserts that the plan qualifies as deliberative because it discusses "the FBI and American Embassy's statutory interests and responsibilities regarding any U.S. involvement in the event of a funeral for Nelson Mandela."  Third Hardy Decl. ¶ 8.  In particular, the FBI explains that it "is

---

[2] The FBI also invoked FOIA Exemption 7(E) to justify withholding this document, which the Court addresses below.  See infra Section III.G & n.8.

outlining its potential actions at a future event and how they relate to not only the American Embassy but to South African State officials . . . and is soliciting input and recommendations from these and other agencies." Id.

Shapiro rejoins that the FBI has not established that the operational plan is "deliberative," and, thus, Exemption 5 does not apply. The Court tends to agree. It is not apparent, based on the FBI's declaration alone, how a security plan for attending a funeral relates to any "legal or policy issues." Logistical details around funeral arrangements are far from the "conclusions, recommendations, or opinions" that Congress intended to protect under the exemption. Playboy Enters., Inc. v. DOJ, 677 F.2d 931 (D.C. Cir. 1982). And while the FBI might have been waiting for other agencies or foreign governments to supply information before finalizing its plan, that does not necessarily transform it from a fact-based plan (with a few missing details) into an evaluative analysis involving legal or policy discussions across different entities. Moreover, it is unclear from the record what the FBI meant by "the FBI and American Embassy's statutory interests and responsibilities," and much less, why they would involve legal and policy issues. Based on the FBI's rather vague explanations, the Court cannot determine if Exemption 5 is justified and therefore will reserve judgment on this issue and order the agency to submit the Operational Plan for *in camera* review.

### C. Exemption 7 Generally

Under Exemption 7, agencies can withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information" would create certain statutorily enumerated harms. 5 U.S.C. § 552(b)(7). To properly invoke this exemption, an agency must first satisfy a two-part test crafted by the D.C. Circuit to show that the records are law enforcement records: First, the agency should identify the person or incident that is the focus of the investigation and specify the "connection between that individual or

incident and a possible security risk or violation of federal law[,]" and, second, the agency must show that its "investigatory activities are realistically based on a legitimate concern that federal laws have been or may be violated or that national security may be breached." Shapiro v. DOJ, 37 F. Supp. 3d 7, 28 (D.D.C. 2014) (citing Pratt v. Webster, 673 F.2d 408, 413 (D.C. Cir. 1982 and quoting King v. DOJ, 830 F.2d 210, 229–30 (D.C. Cir. 1987)) (internal quotation marks omitted). "This inquiry, while necessarily deferential, is not vacuous." Shapiro, 37 F. Supp. 3d at 28 (quoting King, 830 F.2d at 229–30).

The FBI offers a series of declarations from Mr. Hardy to support its position that the relevant documents were compiled for law enforcement purposes. Initially, Hardy explained that several of the records were compiled during "multiple FBI criminal investigations of threats made against Mandela" and recited that the remaining records were created in "furtherance of FBI's law enforcement and national security missions." First Hardy Decl. ¶ 63. Shapiro objects to the latter justification as too generic to carry the FBI's burden of proving that *each* withheld document related to a law enforcement purpose. Pl.'s Cross-MSJ 11 (citing Campbell v. DOJ, 164 F.3d 20, 33 (D.C. Cir. 1998)). The FBI, in response, points to its *in camera*, *ex parte* declarations to provide the missing details, which it believes are too sensitive to reveal on the public record. See Third Hardy Decl. ¶ 10. After carefully reviewing these documents, the Court finds that the FBI has sufficiently established that the withheld documents were compiled for law enforcement purposes and are based on legitimate concerns regarding potential violations of the law or threats to national security.

### D. Exemption 7(A)

Exemption 7(A) requires agencies to show that information compiled for law enforcement purposes "could reasonably be expected to interfere with enforcement proceedings" in order to withhold it. 5 U.S.C. § 552(b)(7)(A). The FBI invoked this exemption to redact "names, personal

identifying information, file numbers, and activities of third parties" from three pages of records

pertaining to active, ongoing investigations: Mandela 520-521, which concern "a fugitive from

justice in an ongoing domestic terrorism case who has not yet [been] apprehended[,]" and Mandela

1160, which "concerns the subject of an ongoing domestic terrorism investigation." First Hardy

Decl. ¶ 77.

  Shapiro challenges these withholdings by arguing that the FBI has failed to adequately

explain the harm that would be caused by disclosing the redacted information because the

information might already be publically available. Pl.'s Reply Cross-MSJ ("Reply") 2–3. But,

contrary to Shapiro's arguments, the FBI has offered sufficient explanations: It stated that

disclosing the redacted material in Mandela-1160 could "expose potential leads and/or suspects the

FBI identified" in relation to an on-going domestic terrorism investigation and releasing the

concealed information in Mandela 520–521 could harm the "on-going investigation by impeding

the FBI's efforts to locate the fugitive." Third Hardy Decl. ¶¶ 12–13. The agency also clearly

indicated that it withheld information *related* to a fugitive, not just the individual's fugitive status

which might be publicly known, and Shapiro has not offered any evidence to discredit these

explanations. The Court, therefore, finds that "[t]he [FBI's] declarations, viewed in light of the

appropriate deference to the executive on issues of national security," satisfy its burden in justifying

withholdings under Exemption 7(A). See Ctr. for Nat. Sec. Studies v. DOJ, 331 F.3d 918, 926–27

(D.C. Cir. 2003) ("[B]oth the Supreme Court and this Court have expressly recognized the

propriety of deference to the executive in the context of FOIA claims which implicate national

security.").

  **E. Exemption 7(C)**

  An agency may also withhold "records or information compiled for law enforcement

purposes" if their production "could reasonably be expected to constitute an unwarranted invasion

of personal privacy."  5 U.S.C. § 552(b)(7)(C).  "Exemption 7(C) requires the agency and the reviewing court to weigh the public interest in the release of information against the privacy interest in nondisclosure."  Schrecker v. DOJ, 349 F.3d 657, 661 (D.C. Cir. 2003) (citing United States DOJ v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 762 (1989)).  While the D.C. Circuit has "consistently supported nondisclosure of names or other information identifying individuals appearing in law enforcement records, including investigators, suspects, witnesses, and informants[,]" it has instructed that the privacy interest at issue "may be diminished where the individual is deceased."  Schrecker, 349 F.3d at 661.  An agency must, therefore, make "a reasonable effort to ascertain life status."  Id. at 662.

Shapiro argues that the FBI has failed to justify its invocation of Exemption 7(C) to redact personal information concerning six categories of individuals:  FBI special agents and support personnel, non-FBI government personnel, local law enforcement, third parties mentioned in criminal investigative files, third parties who were of investigative interest to the FBI, and third parties who provided information to the FBI during the course of an investigation.[3]  First Hardy Decl. ¶¶ 68–75.[4]  Shapiro objects to the 7(C) redactions on two main grounds:  (1) the FBI has not made reasonable efforts to determine if the relevant individuals are still alive and (2) when balancing interests, the FBI did not take into account the fact that individuals who had been

_____

[3] The FBI also invoked Exemption 6 to justify these redactions because both exemptions require the agency to balance an individual's privacy interest against the public's interest in disclosure.  The Court focuses its analysis on Exemption 7(C) because "[it] is more protective of privacy than Exemption 6" and thus establishes a lower bar for withholding material.  ACLU, 655 F.3d at 6 ("Although the [defendant] relied on both exemptions . . . we need only consider whether it properly invoked Exemption 7(C).").

[4] Redacted personal information includes, but is not limited to, "dates of birth, social security numbers, addresses, employment and/or position, telephone numbers, and/or other personal information."  First Hardy Decl. at 34 n.28.

convicted of crimes might have a diminished privacy interest as compared to individuals that were merely investigated by the FBI.  Pl.'s Cross-MSJ 14–15.  In support of his position, Shapiro points to a specific redaction that he believes references two individuals, the Bankston twins, who were convicted of the 1973 murder of Black Muslim leader James Shabazz and passed away decades ago.  See Pl.'s Reply 4–5; Pl.'s Cross-MSJ, Ex. 19–20 (redacted record and article referencing Bankston twins' conviction).

To Shapiro's first point, the FBI responds that it uses two methods to determine an individual's "life status":  "It checks each name against a current list of deceased individuals from various walks of life (i.e. former special agents, public figures, politicians, notorious individuals) . . . [and it] uses information within the file itself to determine if an individual is alive or deceased."  Third Hardy Decl. ¶ 14.  While Shapiro urges the Court to require the FBI to search for each individual in a Social Security database, it is not apparent from the record that the FBI had the means to do so.  And, even if it did, it would still be unreasonable to require it to look for individuals' social security numbers considering the large volume of responsive records and names.  See Schrecker, 349 F.3d at 664 ("To require the Government to shoulder such a potentially onerous task—with dubious prospects of success—goes well beyond the 'reasonable effort' demanded in this context").  Given agencies' "systemic and case-specific exercise[] of discretion and administrative judgment and expertise, [this] is hardly an area in which the courts should attempt to micro manage the executive branch[.]"  Schrecker, 349 F.3d at 662.  Accordingly, the Court finds that the FBI has met "its obligation to take basic steps to investigate information that could affect the privacy interests at stake[.]"  Johnson v. Exec. Office for U.S. Attorneys, 310 F.3d 771, 775–76 (D.C. Cir. 2002).

Shapiro's second argument is more persuasive.  In its declarations, the FBI discusses the public interest at stake when disclosing personal information of various types of individuals.  For

13

the fifth category of challenged redactions (individuals of investigative interest) the FBI states that "being identified as a subject of a criminal investigation carries a strong negative connotation and a stigma." First Hardy Decl. ¶ 73. Therefore, disclosing criminal suspects' names could "subject them to harassment or embarrassment, as well as undue public attention." Id. Such a privacy interest differs in degree though when that individual was not merely suspected, but publicly charged and convicted of a crime, such as in the example offered by Shapiro. If Shapiro's supposition that the Bankston twins' surname was redacted is correct, the FBI would need to justify why revealing their surname in conjunction with the fact that were convicted of crimes implicates privacy concerns that outweigh the public's interest in transparency. See ACLU, 655 F.3d at 7 ("This is not to say that a convicted defendant has *no* privacy interest in the facts of his conviction. . . . But it is to say that those interests are weaker than for individuals who have been acquitted or whose cases have been dismissed. . . . And they are plainly substantially weaker than the privacy interests of individuals who have been investigated but never publicly charged at all." (citations omitted)). It might be that a convicted individual's privacy interest would still win out, but the FBI needs to take the public nature of his or her conviction into account when conducting the balancing, which it has failed to establish that it did here. Cf. Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review, 830 F.3d 667, 675 (D.C. Cir. 2016).

The FBI has, therefore, failed to meet its burden to demonstrate why Exemption 7(C) applies to the specific redaction challenged by Shapiro, and to other redactions related to individuals who have been convicted of offenses.[5] Accordingly, the Court will deny both motions

---

[5] Shapiro argues that the FBI has failed to meet its burden with respect to all 7(C) redactions. But the Court declines to go that far. In its declarations, the FBI has adequately explained why the names and personal information of government personnel, FBI agents, law enforcement, and informants merit protection.

for summary judgment on this issue.  It will direct the FBI to weigh the private and public interests at stake when an individual's name is being released in connection with his conviction for an offense, and, depending on the outcome, either release the requested information within 45 days or renew its summary judgment motion with a supplemental declaration justifying its position.

### F.  Exemption 7(D)

The next law-enforcement-related exemption relied on by the FBI, Exemption 7(D), shields information that "could reasonably be expected to disclose the identity of a confidential source . . . and, in the case of a record or information compiled by a criminal law enforcement agency conducting a lawful national security intelligence investigation, information furnished by a confidential source." 5 U.S.C. § 522(b)(7)(D).  "There is no general presumption that a source is confidential within the meaning of Exemption 7(D) whenever a source provides information to a law enforcement agency in the course of a criminal investigation." Petrucelli, 51 F. Supp. 3d at 168 (quoting DOJ v. Landano, 508 U.S. 165, 181 (1993)) (internal quotation marks omitted).  Instead, an agency must establish a source's confidentiality on a case-by-case basis, either by showing that the source "provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred." Williams v. FBI, 69 F.3d 1155, 1159 (D.C. Cir. 1995) (per curiam) (quoting Landano, 508 U.S. at 170–74).  Probative evidence of an express grant of confidentiality includes "declarations from the agents who extended [them], contemporaneous documents from the FBI files reflecting [their existence], evidence of a consistent policy of expressly granting confidentiality to certain designated sources during the relevant time period, or other such evidence that comports with the Federal Rules of Evidence." Petrucelli, 51 F. Supp. 3d at 168–69.

The FBI redacted six categories of information based on Exemption 7(D):  (1) confidential-source file numbers, unique designations used in reference to information provided by a particular

source; (2) confidential-source symbol numbers, identifiers assigned to sources operating under an

express grant of confidentiality; (3) information provided by source-symbol-numbered informants;

(4) names, identifying data, and information provided by sources operating under an implied

assurance of confidentiality; (5) information supplied by foreign government agencies operating

under an express assurance of confidentiality; and (6) names, identifying data, and information

provided by non-source-symbol-numbered informants operating under an express assurance of

confidentiality.  First Hardy Decl. ¶ 38.  Shapiro challenges the withholding of information in all of

these categories save the first.

   With regards to the second and third categories, Shapiro argues that the FBI has not

established that revealing a single source number alone (without disclosing additional information)

would create a risk of exposing the source's identity.  Pl.'s Reply 9.  Turning to the 7(D) analysis,

the FBI has established that these sources are confidential:  permanent source symbols are assigned

"in sequential order to confidential informants who report information to the FBI on a regular basis

pursuant to an *express assurance of confidentiality*."  Third Hardy Decl. ¶ 17.  And while Shapiro

alleges that only repetitive references to a source number or the combination of a source number

with the content of the information the source provided would risk exposure, the FBI's declaration

confirms that, because a confidential source symbol is unique to an informant, by disclosing this

number "persons knowledgeable of the FBI's investigations could ascertain their identity."  Third

Hardy Decl. ¶ 18.  In light of the FBI's expertise in source management and retention, this

establishes a reasonable expectation of disclosure that Shapiro has failed to overcome.  Therefore,

the Court finds that the FBI's 7(D)-2 and 3 redactions are properly applied.

   The fifth and sixth categories of redactions are likewise justified because the FBI has

provided probative evidence that sources were granted express assurances of confidentiality.  With

respect to foreign government agencies, the FBI has explained that it "has many agreements with

foreign governments under which security and/or criminal law enforcement information is exchanged." First Hardy Decl. ¶ 88.  The particular foreign government agency that the FBI sought to protect via its redactions requested that its identity, relationship with FBI, and the information it provided be classified and withheld.  Id.  The FBI confirmed that its request was honored "under applicable information sharing agreements" and that this information only became declassified because the documents were older than twenty-five years.  Third Hardy Decl. ¶ 23.  While the relationship might now be declassified, the fact remains that the foreign government agency was given an express assurance of confidentiality when the information was exchanged.  Furthermore, the only reason the FBI did not provide evidence of the information-sharing agreement itself was that "[t]he release of official United States Government documents revealing the existence of such a confidential relationship with a long-term foreign government partner . . . reasonably could be expected to strain relations between the United States and the foreign government and lead to negative diplomatic, political, or economic repercussion." Id.  This showing sufficiently establishes that an express grant of assurance existed between the parties, thus, warranting the exemption.  The FBI has likewise established that it provided express assurances of confidentiality to other third-party sources, whose information it redacted from responsive records.  These sources were identified with a "T-1" designation within the responsive records, which the FBI explains is an "indicat[ion] [that] the information provided by this source was provided with the express assurance of confidentiality."  The Court again concludes that this is sufficiently probative evidence of an express grant of confidentiality, and will therefore uphold the 7(D)-6 redactions.  See Petrucelli, 51 F. Supp. 3d at 169 (finding that the phrase "Protect Identity" which appeared after the source's name was "probative evidence that the sources did in face receive express grants of confidentiality").

The final category of redactions challenged by Shapiro corresponds to sources that provided information under an implied assurance of confidentiality.  "When no express assurance of confidentiality exists, courts consider a number of factors to determine whether the source nonetheless spoke with an understanding that the communication would remain confidential."  Roth v. DOJ, 642 F.3d 1161, 1184 (D.C. Cir. 2011) (internal quotation omitted).  "These factors include the character of the crime at issue, the source's relation to the crime, whether the source received payment, and whether the source has an ongoing relationship with the law enforcement agency and typically communicates with the agency only at locations and under conditions which assure the contact will not be noticed."  Id. (internal quotation omitted).  Shapiro challenges the FBI's assertions that such implied assurances existed at the time the information was provided.

Before delving into this analysis, it is important to recognize the limited scope of Exemption 7(D)-4's application to the redacted records here.  The vast majority of the 7(D)-4 redactions were applied in conjunction with either Exemption 1, 3, 6, and 7(C).  See First Hardy Decl. ¶ 86.  In fact, of the 16 pages that bear 7(D)-4 redactions, only one is not also covered by another statutory exemption:  Mandela-687.[6]  Because the Court has already upheld the application of these overlapping exemptions, it will confine its discussion to Mandela-687, a report summarizing information provided by an FBI informant regarding the South African government's position on the location of Mandela's detention following his arrest.  Given the nature of the records, the FBI needed to rely on information found within the file itself to determine whether a source was likely

---

[6] The FBI applied Exemption 7(D)-4 to the following pages: Mandela-460, 488, 529, 686, 687, 1190, 1191, 1496, 1497, 1498, 1499, 1501, 1502, 1503, 1504, 1505.  First Hardy Decl. ¶ 86 n.36.  Exemption 1 covers 460, 488, 686, 1497, 1499, 1502, 1503, 1504, 1505.  Id. at 20 n.18. Exemption 3 covers 460, 488, 1190, 1191, 1496, 1499, 1502, 1503, 1504, 1505.  Id. at 26 n.22. And Exemptions 6 and 7(C) cover 460, 488, 529, 1190, 1191, 1496, 1497, 1498, 1499.  Id. at 29–36 nn.25–31.

to have believed his or her participation in an investigation would remain confidential.  See Third Hardy Decl. ¶ 20.  This limited the amount of information available to the FBI when making its determination.  See id.  Typically, in those instances "where an FBI Special Agent has indicated that an individual is sufficiently situated whether by their proximity to information or their actual access to information," the FBI employs a practice of redacting their information pursuant to an implied assurance of confidentiality.  Id.  The FBI justifies this practice because proximity or access to targets of investigative or national security interest likely exposed these sources "to potential significant harms that last through today, should their association and cooperation with the FBI be publicly disclosed."  First Hardy Decl. ¶ 86.  Finally, in the FBI's experience, "the identities of these sources and the singular information they provided would only be provided with the belief that their cooperation with the FBI would not be revealed."  Id.

The source in Mandela-687, for example, had "provided detailed, reliable, and accurate information previously."  Id.  In examining the disclosed portions of the record, the Court can see that the source had provided information regarding Mandela's then-current whereabouts and had offered an opinion as to what the South African government intended to do with him.  Pl.'s Reply, Ex. 3 (Mandela-686-88).  It would be reasonable for the FBI to infer that this type of information and analysis of the apartheid government's plans and intentions came from a source with a high-level political connection or "ready access" to areas of national security interest.  In addition, such a source might bear significant risks if their identity was revealed, including "disastrous effect on [the source's] career," risk of retaliation, and threats to the source's family.  First Hardy Decl. ¶ 86.  All of these inferences would support a finding that the Mandela-687 source would only provide information if the source believed his or her identity would stay confidential.  Because Shapiro has not offered any evidence to challenge these logical conclusions, the Court will uphold the FBI's application of the 7(D)-4 redaction to Mandela-687.

### G. Exemption 7(E)

FOIA Exemption 7(E) authorizes agencies to withhold "records or information compiled for law enforcement purposes [that] would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). "Satisfying the exemption is a 'relatively low bar' in this Circuit." Bigwood v. Dep't of Defense, 132 F. Supp. 3d 124, 152 (D.D.C. 2015) (quoting Blackwell v. FBI, 646 F.3d 37, 42 (D.C. Cir. 2011)). An agency need only "demonstrate logically how the release of the requested information [may] create" a risk of circumvention. Blackwell, 646 F.3d at 42 (internal quotation omitted). And "where an agency specializes in law enforcement, its decision to invoke Exemption 7 is entitled to deference." Barnard v. Dep't of Homeland Sec., 598 F. Supp. 2d 1, 14 (D.D.C. 2009) (quoting Campbell, 164 F.3d at 32).

The FBI applied Exemption 7(E) in a categorical fashion based on the type of information it was redacting. Shapiro challenges the following categories of redactions:[7] (1) sensitive details regarding security at special events, such as Mandela's visits to the United States; (3) the investigative focus of a particular investigation; (5) the methods the FBI uses to collect and analyze information obtained for investigative purposes; (6) database identifiers or the format of database entries; (8) sensitive file numbers or sub-file names that are created through a combination of a classification number, designation for the originating office, and case number; and (10) dates investigations were initiated or investigation types. Pl.'s Cross-MSJ 27–28. The majority of Shapiro's grievances are easily dismissed.

---

[7] The following numbers track the FBI's categorization of the redactions. The missing numbers were not challenged by Shapiro, and need not be addressed here.

With respect to sensitive security details for special events in the past, Shapiro argues they have no bearing on techniques used today and, therefore, disclosing them would not risk circumvention of the law.  The FBI has unequivocally confirmed though that "[it] only withheld security details still in use today or similar in nature to methods used today for protection."  Third Hardy Decl. ¶ 27.  Release of such details could therefore "potentially risk the lives of individuals providing protection as well as those seeking protection."  First Hardy Decl. ¶ 91.  For example, "determining a pattern in the FBI's use of certain types of vehicles or travel preferences could present a problem," by "allowing criminals to predict the actions of security personnel."  Id.  The FBI's assurances thus demonstrate a sufficient nexus between its withholdings and the risk of circumvention to justify the use of the exemption.[8]

The explanations offered by the FBI likewise justify its withholdings of information related to the subjects and tools of its investigations under 7(E)-3 and 7(E)-5.  Given the wide swath of records uncovered that mention Mandela (often merely in passing), the FBI redacted material concerning the subject of investigations when it "reveal[ed] details of these investigations, the priority the FBI place[d] on the investigations, [or] when combined with other public information . . . could reveal the volume of information gathered in relation to a particular area of crime or a subject."  Third Hardy Decl. ¶ 28.  Disclosing this information, the FBI asserts, "would allow a criminal to gauge the FBI's strengths and weaknesses within certain areas of the criminal arena and

_____

[8] The FBI also invoked Exemption 7(E)-1, in conjunction with Exemption 5, to withhold (in full) a draft Operations Plan concerning preparations for sending a U.S. delegation to South Africa for former President Mandela's funeral.  Third Hardy Decl. ¶ 9.  The Court concluded that the FBI's application of Exemption 5 might not be justified for reasons discussed earlier in the opinion.  See supra Section III.B.  Because the Court generally upholds the application of Exemption 7(E) to protect sensitive security details that "are still in use today or similar in nature to methods used today," it will request that the FBI indicate what information would fall within this protection when submitting the full ten-page plan for in camera review.

structure their activities in a manner that avoids detection and disruption by the FBI." First Hardy Decl. ¶ 92. Shapiro contends that there is no risk of circumvention when details are revealed from the "yellowing pages of long-closed FBI files." Pl.'s Reply 10. Even crediting his unfounded assertion that all these files are "long-closed," Shapiro has failed to offer any evidence that this information would not remain relevant to deciphering the patterns of the FBI's investigations and its current strengths and weaknesses. With respect to the collection and analysis of information used for investigative purposes, the FBI redacted information on 13 pages that would reveal "how and from where [it] collects information and methodologies[.]" First Hardy Decl. ¶ 94. It did so because disclosing the information "would enable subjects of FBI investigations to circumvent similar *currently used* techniques." Id. (emphasis added). Criminals could use this information, in the FBI's view, "to educate themselves about the techniques employed . . . allow[ing] [them] to take countermeasures to circumvent the effectiveness of these techniques to continue to violate the law and engage in intelligence, terrorist, and criminal activities." Id. Exposing the methods used to collect information, along with the focus of those investigations, would also purportedly "reveal resource allocations to that particular area of crime." Third Hardy Decl. ¶ 27. These facially logical explanations of why disclosure of information regarding closed cases could reveal "currently used" law enforcement techniques are sufficient to defeat Shapiro's obsolescence argument.[9]

---

[9] Shapiro points to three specific redactions as examples of unwarranted 7(E) withholdings. After a close examination of Mandela 52, 62, and 78, however, the Court is even more convinced that these redactions fall well within Exemption 7(E)'s protection. Each redaction seems to describe a particular observation or result of a fingerprint examination. Disclosing such information could, therefore, reasonably disclose information about how the FBI analyzes fingerprints and what sort of details a fingerprint examination could reveal to a criminal hoping to avoid forensic detection.

Shapiro next attacks the FBI's decision to withhold the names of its investigative databases and investigative details, such as the type of investigation and the date it was initiated, from the records it released.[10] He argues that at least one database name had already been disclosed in a prior FOIA response, and alternatively, that the FBI has not established that these names are not generally known to the public. Pl.'s Cross-MSJ 30–31. The FBI rejoins that the name of the database alone is not the issue, but rather the "nexus of publicly available information with specific records." Third Hardy Decl. ¶ 30. Unveiling this nexus "would reveal what specific types of information are considered relevant to these databases as well as the methods for input of data [which] could enable criminals to employ countermeasures to avoid detection." First Hardy Decl. ¶ 95. And an understanding of which databases are used to track different types of crimes or investigations and the sort of details they maintain, for instance, could provide a criminal mastermind a deeper insight into how the FBI conducts its investigative activities. See Gosen v. U.S. Citizenship & Immigration Servs., 75 F. Supp. 3d 279, 290 (D.D.C. 2014) (upholding the government's redaction of database names). Likewise, if the FBI were to reveal the type of investigation or the date it commenced, individuals would potentially discern "the type of activities that would trigger a full investigation as opposed to a preliminary one . . . which would allow [them] to adjust their behavior" to avoid detection. First Hardy Decl. ¶ 99. For these types of withholdings, the FBI is relying on a "mosaic" argument to justify its redactions: The idea that "bits and pieces of data may aid in piecing together bits of other information even when the individual piece is not of obvious importance in itself." Sims, 471 U.S. at 178. So that "[w]hat may seem trivial to the uninformed, may appear of great moment to one who has a broad view of

---

[10] Shapiro also questions the application of this exemption to a database entry of an individual's date of birth. The FBI also justified this redaction, however, under Exemptions 6 and 7(C), which the Court previously addressed and upheld. See supra Section III.E. There is no need then for the Court to decide if 7(E) -6 was properly applied to Mandela-1032.

the scene and may put the questioned item of information in its proper context." <u>Ctr. for Nat. Sec.</u> <u>Studies</u>, 331 F.3d at 928–29.  The FBI is concerned that releasing hundreds of these files at once, each with bits of information disclosed, would provide someone a holistic view of the FBI's investigatory techniques, processes, and priorities.  <u>See</u> Third Hardy Decl. ¶ 41.  Finding this explanation generally convincing, the Court will again defer to the FBI's reasoned judgment in areas of national security and counterterrorism, and concludes that the FBI has passed the "low bar" imposed by 7(E).  <u>Cf.</u> <u>United States v. Yunis</u>, 867 F.2d 617, 623 (D.C. Cir. 1989) ("Things that did not make sense to the District Judge would make all too much sense to a foreign counter-intelligence specialist who could learn much about this nation's intelligence-gathering capabilities from what these documents revealed about sources and methods."); <u>see also</u> <u>Shapiro</u>, 2017 WL 908179 at *11 ("Plaintiffs' request must be construed as part of a larger mosaic.  Understood in that manner, aggregate information about the number of files or documents that bear a designation for [terrorism] may shed considerable light on the overall resources that a particular office . . . is devoting to investigating related crimes.").

Lastly, Shapiro spends many pages challenging the FBI's redaction of sensitive file numbers from over 80 pages of released records.[11]  Many of these arguments and the FBI's responses to them were presented to and thoroughly analyzed by Judge Moss in an opinion published earlier this month.  <u>See</u> <u>Shapiro</u>, 2017 WL 908179 at *9–12.  As in that case, this Court is also unpersuaded by the majority of Plaintiff's arguments because the FBI has shown that releasing this information could "provide[] a birds-eye view of FBI resource allocation and thus, FBI vulnerabilities and capabilities."  Third Hardy Decl. ¶ 33.  The Court also recognizes, however, that in the case of

_____

[11] Almost all of these exemptions were applied in conjunction with Exemptions 1 and 3. From the Court's comparison, the only redactions that are covered solely by Exemption 7(E)-8 are Mandela-1216, 1217, and 1517.  <u>See</u> First Hardy Decl. ¶ 98 n.45.

decades-old investigations, like those potentially at play here, "the FBI needs to do more to explain how its disclosure of information revealing the originating office for that investigation or any other information, poses a present day threat of circumvention of the law." Id. at *12.  Accordingly, the Court cannot discern on the present record if Mandela-1216, 1217, and 1517 relate to active, recently closed, or decades-old investigations.  It will therefore deny both motions for summary judgment as to these three redacted pages, and order the FBI to either release the records without redactions or renew its summary judgment motion along with a supplemental declaration presenting "additional evidence and explanation regarding the specific risk posed by disclosure of [these] file numbers." Id.

### H.  Non-Responsiveness Determinations

Shapiro's final point of contention rests with the FBI's definition of a responsive *record* for purposes of FOIA.  Pl.'s Cross-MSJ 44.  In Shapiro's opinion, a single (or a few) pages from a larger compilation of documents cannot form the entirety of a responsive record.  Rather, once the FBI has found a reference to the subject of a FOIA request in a multi-topic document—whether it be a book, manual, memorandum, or case file—it is under an obligation to mark the entire document responsive and release it to the requester subject only to statutorily authorized exemptions.  In support of his view, Shapiro has identified several examples of a series of records released by the FBI that are missing pages.  See id. at 44–45 (listing Mandela 532-543, 1175-1186, 1177-1178, 516-517, 456-57, 458-460 as examples).  To illustrate, Mandela 532-543 are pages discussing the United States' Communist Party support for Mandela and the African National Congress, and they appear to the Court to be part of a larger memorandum reporting on the activities of the Communist Party's various leaders and regional offices.  See Pl.'s Cross-MSJ, Ex. 3 (Mandela 532).  Shapiro asserts that the entire memorandum should be considered *one* responsive record because all of the pages belong to a larger compilation.  The FBI cannot, therefore, simply

withhold pages 4 and 5 from it (which appear to be missing) unless it establishes that a FOIA exemption applies to those specific pages.  Pl.'s Cross-MSJ 44–45 ("The document skips from page 3 (Mandela-534) to page 6 (Mandela-535)").

The FBI takes a different view.  The agency chiefly takes issue with Shapiro's framing of its responsiveness determinations and his proposed definition of a responsive record.  In conducting the search relevant here, the FBI applied search terms from Shapiro's request, which led to responsive results contained on pages within larger documents, such as "memorandums, booklets, handouts, intelligence information reports," that "merely mention[ed] the subject of the FOIA request in the context of other topics[.]"  Third Hardy Decl. ¶ 43.  Relying on long-standing practice and guidance from the DOJ's Office of Information Policy, the FBI "consider[ed] only the pages mentioning the subject of the request and any pages necessary for context to constitute the 'responsive record' for FOIA purposes."  Id.  Consequently, from the FBI's perspective, the "missing pages" Shapiro alludes to are not part of a responsive record, and the FBI is not obligated by FOIA to release them.

Both parties rely on the D.C. Circuit's recent decision in Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review ("AILA"), 830 F.3d 667 (D.C. Cir. 2016), to support their positions.  See Pl.'s Cross-MSJ 44–45; Def.'s Reply 11–13.  In AILA, the agency responding to the FOIA request had located responsive records, but had redacted information from email chains, often no more than a sentence, that it deemed was unrelated and unresponsive to the request.  Id. at 677.  The D.C. Circuit held the redactions to contravene FOIA, which "compels disclosure of the responsive record—i.e., as a unit—except insofar as the agency may redact information falling within a statutory exemption."  Id. (citing 5 U.S.C. § 552(a)(3)(A), (b)).  It reasoned that "nothing in the statute suggests that the agency may parse a responsive record to redact specific information within it even if none of the statutory exemptions shields that information from disclosure. To the

contrary, in expressly allowing for—and only for—"deletion of the portions" of a responsive record which are exempt, the statute reinforces the absence of any authority to delete portions of a responsive record which are *not* exempt." Id. at 677–78 (internal quotation omitted). Yet AILA does not resolve the issue in dispute here:  Namely, what constitutes a responsive record to begin with.  See id. at 678 ("Here, the parties have not addressed the antecedent question of what constitutes a distinct 'record' for FOIA purposes, and we have no cause to examine the issue.").

What AILA does do is provide helpful guidance to inform the Court's analysis.  First, the AILA court grounded its analysis upon the agency's own definition of a responsive record.  Id. Second, it noted that the FOIA itself does not contain a functional definition of "record" by which agencies can conform their practices.  See id.; McGehee v. CIA, 697 F.2d 1095, 1114 (D.C. Cir.), on reh'g sub nom. McGehee v. CIA, 711 F.2d 1076 (D.C. Cir. 1983).  Rather, throughout the history of FOIA, government entities have effectively defined what a record is when "undertak[ing] the process of identifying records that are responsive to a request."  AILA, 830 F.3d at 678. Relatedly, while FOIA and the courts might not have defined a record, the DOJ's Office of Information Policy has provided a helpful set of criteria for "agencies to take into account when determining whether it is appropriate to divide [documents that cover multiple, unrelated topics] into discrete 'records.'"  Id. (citing DOJ, OIP Guidance: Determining the Scope of a FOIA Request, FOIA Update, Vol. XVI, No. 3 (1995), https://www.justice.gov/oip/blog/foia-update-oip-guidance-determining-scope-foia-request).  Those criteria include the requester's intent, maintaining the integrity of the released documents, the scope of the request, the agency's own knowledge regarding storage and maintenance of documents, efficiency, cost, resource allocation, and maintaining the public's trust in transparency.  And last but not least, AILA set a minimum bar for what *cannot* be considered a discrete, non-responsive record:  a single (or perhaps a few) sentences within an otherwise responsive paragraph.  Id. at 679.

Applying these broad principles to the facts of this case, the Court concludes that the FBI's practice is consistent with the D.C. Circuit's guidance. The FBI's search returned responsive material and information, some of which was found in document compilations covering multiple, unrelated topics. See Third Hardy Decl. ¶ 43. It located the responsive pages related to Shapiro's FOIA request, and included additional pages, as necessary, to provide context. Id. This set of documents (*i.e.* pages) became the responsive record, which the FBI then reviewed for statutory exemptions. The FBI easily clears AILA's minimum hurdle because it did not withhold single sentences, or even paragraphs, as non-responsive from within the results of its search. But rather, relying on its own knowledge of its documents and DOJ OIP guidance, it determined that "it was appropriate to divide a document [covering multiple, unrelated topics] into discrete 'records.'" AILA, 830 F.3d at 678. What is more, the FBI's practice is also in keeping with practical considerations. If an agency was forced to turn over a full manual or entire report every time a single page contained a responsive term, the amount of time, labor, and cost that would be required to review this purportedly "responsive" material for exemptions would be exponential, hindering the agency's ability to process multiple requests efficiently or allocate its resources effectively.

This does not put an end to the Court's inquiry though. As with most challenges under FOIA, the FBI here bears the burden of justifying its actions—such as when crafting a search reasonably calculated to uncover responsive records, properly applying exemptions, or segregating non-exempt material. The identification of or definition of a responsive record in a particular case is no different: The burden will first rest with the agency to justify its actions when singling out a responsive record from a greater compilation of documents. If satisfactory, the agency's explanation will merit a presumption of good faith. The requester, however, remains free to challenge the agency's explanation by offering evidence of positive indicia that the responsive material was inappropriately withheld or of bad faith on the part of the agency. The agency will

then have an opportunity to respond to the requester's allegations, and the Court will review their arguments on the merits.  In this case, Shapiro has brought several documents to the Court's attention as to which he challenges the FBI's responsiveness determination.  Without further details in the record about how the FBI determined which pages within these documents were responsive, the Court is unable to resolve this issue.  Therefore, the Court will deny both motions for summary judgment as to this issue and will order the FBI to, within 45 days, release the missing pages from the particular records identified by Shapiro or renew its summary judgment motion along with a supplemental declaration explaining its determinations in light of the analysis above.

## IV.    Conclusion

For the foregoing reasons, the Court will grant in part, reserve judgment in part, and deny in part the FBI's motion for summary judgment, and reserve judgment in part and deny in part Shapiro's cross-motion for summary judgment.  A separate Order accompanies this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>March 31, 2017</u>